# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Haley, 2011 IL App (1st) 093585**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN HALEY, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-09-3585 |
| Filed | November 1, 2011 |
| Rehearing denied | November 21, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for involuntary manslaughter following his prosecution for first degree murder based on an incident in which he pushed a fisherman into a harbor was upheld, where evidence that defendant had pushed another fisherman into the same harbor about a month before the charged offense gave a context to defendant's arrest and was relevant to show defendant's *modus operandi* and that he acted intentionally, and the trial court did not abuse its discretion in finding the probative value of the evidence outweighed any potential prejudice. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-19916; the Hon. John P. Kirby, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Todd T. McHenry, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, Kathleen Warnick, and Adam W. Delderfield, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE HARRIS delivered the judgment of the court, with opinion.

Justices Cunningham and Connors concurred in the judgment and opinion.

## OPINION

¶ 1    Defendant, John Haley, was charged with first degree murder. A jury found Haley not guilty of first degree murder, but guilty of the lesser offense of involuntary manslaughter. The circuit court sentenced defendant to 5 years' incarceration for involuntary manslaughter, with an additional 5-year extended sentence, for a total of 10 years in the Illinois Department of Corrections. We are called upon to determine whether the circuit court properly admitted testimony, as other crimes evidence, of an incident involving defendant one month prior to the instant offense, and whether Haley's sentence was excessive.

¶ 2    We hold that the circuit court did not abuse its discretion in allowing the jury to hear evidence of defendant's other crimes because it was admitted for purposes other than to show defendant's propensity to commit criminal acts. The circuit court did not abuse its discretion in weighing this evidence's probative value to be greater than its prejudicial effect. We also hold that the circuit court did not abuse its discretion in sentencing when focusing on the degree of force defendant used in committing the crime when considering the aggravating factor that defendant's conduct threatened or caused serious harm. The circuit court did not abuse its discretion in balancing the various factors in aggravation and mitigation, including defendant's potential for rehabilitation.

¶ 3                              JURISDICTION

¶ 4    The circuit court sentenced defendant on December 11, 2009. Defendant timely filed his notice of appeal on December 15, 2009. This court granted an amended notice of appeal on September 30, 2010, correcting the indictment number and description of the offense. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution and Illinois Supreme Court Rules 603 and 606, governing appeals from a final judgment of conviction in a criminal case entered below. Ill. Const. 1970, art. VI, § 6; Ill. S. Ct. R. 603 (eff. Oct. 1, 2010); R. 606 (eff. Mar. 20, 2009).

BACKGROUND

¶ 6    Defendant was charged with first degree murder for the death of Du Doan, who drowned after being pushed into Lake Michigan at Montrose Harbor in Chicago, Illinois, during the early morning hours of September 1, 2007.

¶ 7    Pretrial

¶ 8    Before trial, the State filed a motion seeking to introduce proof of other crimes committed by defendant. Specifically, the State sought to introduce the testimony of Ronald Squires, whom defendant pushed into Lake Michigan approximately one month prior to pushing Doan into Lake Michigan in this case. The State offered the evidence of defendant's past crime to show defendant's *modus operandi*. The State also argued that the evidence showed that defendant acted intentionally, that defendant had a callous attitude toward the victim, and that the crimes were of a common design. Additionally, the State argued that it would put defendant's arrest and crime into context. The State contended that "its admission will be essential in rebutting the defendant's almost certain claim *** that he did not intend to kill Du Doan by pushing him in the lake."

¶ 9    During argument before the court, the State contended the incidents had similar circumstances, victims, and location. The State argued the two offenses were so similar that they proved defendant's *modus operandi*. Specifically, both victims were close in age, defendant pushed both victims into the lake under the cover of darkness while the victims were fishing, defendant told accompanying friends what he had done immediately after the incidents, both victims were wearing bulky clothing that would inhibit swimming, and the incidents occurred close geographically. The State also argued that the prior crime showed lack of accident, that defendant's actions were not inadvertent, involuntary, or performed without his knowledge. The State argued the prior incident was important because, although defendant admitted to knowingly and intentionally pushing both victims into Lake Michigan, at first he claimed it was an accident. The State also argued that the other crimes evidence put defendant's arrest into context, as Ronald Squires did not come forward until he found out about Doan's death in this case. The State also argued the evidence negated defendant's anticipated argument that he did not foresee the consequences of his actions. The court, noting that it counted eight possible reasons raised by the State to allow evidence of defendant's other crime into evidence, asked the State if it was seeking to have each of those eight reasons brought in under each individual theory. The court listed the reasons as "*[m]odus operandi*, intent, identity, motive, absence of mistake, common design, and context of defendant's arrest." The State responded, acknowledging that many of the articulated reasons overlapped, but asked that the evidence of other crimes be admitted under all of the reasons it offered.

¶ 10    Defendant argued that the prior crime of pushing Squires in the lake did not make it any more or less probable or relevant that he intended to kill the victim in this case. Defendant also stressed that he already admitted committing the prior crime, so the evidence of his prior crime only shows a propensity to commit crime.

¶ 11    The court, in issuing its ruling, stated it considered the question before it as "twofold."

First, whether the proof of defendant's other crime was admissible in the present case, and second, whether it was relevant, where defendant gave a video statement indicating he intentionally pushed the victim into Lake Michigan as a prank. The court granted the State's request, finding the proof of defendant's other crime could be used for any purpose other than his propensity to commit crime and that it would be relevant to show "*modus operandi*, intent, identity, motive, and absence of mistake." The court found that the prejudicial effect of the other crimes evidence did not substantially outweigh its probative value.

¶ 12                                  State's Case-In-Chief

¶ 13        The testimony at trial established that defendant was with his friends, Thomas Harrington, Steven Harrington, Bryant Dwayne Thomas, a/k/a Dwayne, and Katie Hoffman before, during, and after the incident. They all testified on behalf of the State. Thomas Harrington testified that on the date of the incident, the group went to two house parties in Chicago where they drank alcohol before going to the Wicker Park neighborhood of Chicago, to continue drinking. At this point it was early Saturday morning and the group took Katie's car and went to Montrose Harbor to eat. At Montrose Harbor, the group headed to the nearest benches. Defendant asked the group "would it be funny if we pushed somebody in the water?" Thomas Harrington testified that he told defendant, "No." The group then walked closer to the pier where defendant again asked the group, "would it be funny if we pushed somebody in the water?" Thomas Harrington recalled Dwayne spoke to defendant, and then defendant pulled away from the group, telling them he was going to watch the sun rise. The group, excluding defendant, decided to go back to the car. As they were walking to the car, Thomas Harrington heard a splash. When they got to the car, defendant ran up behind them laughing and said to the group, "we gotta get outta here." In the car, defendant was laughing as the group sped away and when asked what happened, defendant responded, "the guy looked hot and needed a swim." The group then went to an unnamed café to eat. They spent the night in the car.

¶ 14        Thomas Harrington testified that two days later he spoke with defendant over the phone. Defendant informed him that someone had died at Montrose Harbor. He, along with Steven and Katie, met up with defendant at his girlfriend's house. He testified that defendant had a tattoo of a bird on each side of his neck and various tattoos covered his forearms.

¶ 15        Dwayne testified that he met up with defendant early in the evening the night before the incident. He remembered that later in the evening, after going to a bar and a party at the Flat Iron building located at North Damen and Milwaukee in Chicago, they were joined by Thomas Harrington, Steven, and Katie. In the early morning hours that Saturday, the group decided to go watch the sun rise. After parking, the group started to walk toward benches near the harbor. Dwayne grabbed defendant and told him, "stop being stupid or something to that effect." He testified that he then went back to the car because he thought going to the harbor was "stupid" and he was feeling sick. Katie, Thomas Harrington, and Steven all started walking back to the car. Dwayne recalled that on his way back to the car, he heard someone yell to call the police. Hearing this, he fled because he did not want to get into trouble. Katie, Thomas Harrington, and Steven ran with him. Defendant came up from

behind the group. Everyone got into the car. Dwayne sat in the front seat, Katie drove, and the other three members of the group, including defendant, sat in the back. Dwayne testified that the people in the back were laughing and that defendant stated "he looked hot" as he entered the car.

¶ 16 The Monday after the incident, Dwayne learned that someone had drowned at Montrose Harbor. Later in the day, he spoke with defendant. He then met with defendant at defendant's house. They decided to call a television news journalist named Jay Levine to give an interview. After the interview, they had Levine follow them to the police station.

¶ 17 Katie testified she went to a party on the night before the incident with defendant, Thomas Harrington, Steven, and Dwayne. After, they went to a hot dog place to get food and then to Montrose Harbor. It was defendant's idea to go to the harbor to watch the sun rise. She testified seeing Dwayne grab defendant's arm, and the group walked back to her car. The prosecutor then confronted her with her grand jury testimony in which she stated that defendant started to walk toward a man fishing on the end of the harbor. Katie admitted giving that answer, but claimed she lied to the grand jury. She testified that as she was talking to Thomas Harrington and Steven while walking to her car, she heard a splash. She testified that defendant came running behind her from the area of the splash. The prosecutor read her grand jury testimony, in which she stated that while the group was in the car, defendant said he pushed a man in the water. After being asked why he did that, defendant responded that the man looked like he wanted to go for a swim. She testified that she lied to the grand jury regarding those comments.

¶ 18 Katie further testified that on the Monday after the incident, defendant called her saying a man had drowned at Montrose Harbor. After taking this call, she went to defendant's house. After speaking with the group, she gave Jay Levine an interview. After the interview she went to the police station.

¶ 19 Steven Harrington testified that the night before the incident, he was with defendant, Katie, Thomas Harrington, and Dwayne. They were "out drinking and partying." Steven testified that at Montrose Harbor defendant "started to get a little goofy and was talking about pushing someone in the water." Steven added that "[defendant] said would [it] be funny if I [(defendant)] pushed someone in the water." Steven testified this made him nervous because he is unable to swim. Defendant then broke away from the group, saying he was going to go watch the sun rise. The group, absent defendant, began to walk back toward the car. As they were about halfway to the car, Steven heard a loud splash from behind him. The group then ran toward Katie's car. Everyone got in the car and defendant said "go, go, go." Katie, driving, made a U-turn and drove away. Steven testified that "[defendant] said the guy looked hot and he needed to go for a swim. I [(defendant)] pushed him in." On Monday, defendant called him and they met at defendant's residence. The next morning, Steven received a call from the Chicago police department asking him to come in.

¶ 20 Thomas Harrington, Dwayne Thomas, Katie Hoffman, and Steven Harrington all testified that when speaking with the police initially they were not truthful, but that eventually they told the police the truth.

¶ 21 The State later called Tracy Stanker to the stand. Stanker, who worked for the Cook

County State's Attorney in the grand jury unit at the time of the incident, testified regarding the grand jury testimony of Thomas Harrington, Dwayne, Katie, and Steven. She testified that before the grand jury, Dwayne testified that defendant stated he saw someone fishing who looked hot, so he pushed him into the lake.

¶ 22　The State called three bystanders, who were at or near Montrose Harbor at the time of the incident, to testify. Lance Shirahama and Chung In were fishing at Montrose Harbor and Thomas Earley was taking a walk in the area. Shirahama testified that on the morning of the incident, he was at Montrose Harbor setting up his fishing equipment. He said it was light enough for him to see what he was doing while setting up his fishing equipment. He noticed a man on the same side of the harbor as him fishing near the water. Minutes later, he saw a group of five people gather by a bench near the parking lot. The group consisted of one female and four males. He next heard a splash and saw someone running alone. He noticed the splash come from the same place he had previously noticed the other fishermen. The group of people he had seen gathered by the bench walked toward their car. He used his net to reach for the person in the water, but was unable to do so. He witnessed the man in the water struggling, and then go under the water. Shirahama yelled for help and ran after the man he had noticed running from the scene.

¶ 23　On cross-examination, Shirahama testified that at the time of the incident the conditions were "not dark but not light." He also acknowledged that he did not actually see anyone being pushed into the lake, but only heard the splash.

¶ 24　Chung In testified he was at Montrose Harbor fishing at the time of the incident. He saw a man fishing under a lamppost. Next he saw another man walk behind the fisherman and push him from behind with both hands into the water. He yelled out at the man doing the pushing. The man ran toward the parking area. He observed the fisherman struggling in the water and another fisherman attempting to hand him a fishing net. He testified that he called the police. He testified that he previously saw that the man who pushed the fisherman was with several other people, but that he was alone when he pushed the fisherman into the water. He could not make out the details of the man's face.

¶ 25　Thomas Earley testified he was walking on Montrose Drive near Montrose Harbor. As he was walking, he heard a man whom he now knows is Lance Shirahama yelling "call 911." He also noticed four people moving at a fast pace, with a fifth person following the group "sprinting." The group was headed for the parking area of Montrose Drive. The group, including a fifth person who had by this time caught up with the others, got into a white Dodge Neon automobile and made a fast "U-turn out of the parking lane."

¶ 26　The State called several law enforcement personnel who testified regarding their respective investigations of the incident. Steven Zambello testified that he was a paramedic for the Chicago fire department at the time of the incident and arrived on the scene shortly after receiving the emergency call. He said that Doan was not responding when he was pulled from the water. Zambello testified regarding the lifesaving techniques he attempted on Doan, which were ultimately unsuccessful.

¶ 27　Detective Matthew Rickher testified that he and his partner were assigned to investigate the drowning of Doan. Detective Rickher testified to the recovery of evidence at the scene,

including the victim's vest, which was saturated with water and weighed approximately 20 pounds and his boots, which were also saturated with water and weighed approximately 5 pounds.

¶ 28 Edward Tomasik, the forensic investigator who, along with his partner, was assigned to investigate the death of Doan, testified regarding the video, photographic, and physical evidence he collected both at the scene and at Wiess Hospital, where Doan was taken.

¶ 29 Detective Cheryl Bronkema testified that she was one of several detectives assigned to investigate the death of Du Doan. Detective Bronkema testified regarding her interviews of the witnesses and defendant. Detective Bronkema conducted a lineup for Lance Shirahama and Ronald Squires in which neither made a positive identification of defendant.

¶ 30 Valerie Arangelovich, from the office of the medical examiner of Cook County, testified as an expert in forensic pathology regarding the autopsy she performed on Doan's body. In her opinion, had Doan survived, he most likely would have been in a comatose vegetative state. She opined further that the cause of Doan's death was homicide.

¶ 31 Based on its pretrial motion to introduce evidence of another crime committed by defendant, the State called Eric Kriske and Ronald Squires to the stand. Before either testified, the court informed the jury, "[t]his evidence is being received only for the issues of the Defendant's modus operandi, intent, absence of mistake, and knowledge and may be considered by you only for that limited purpose." Defense counsel noted that they had previously objected to proof of other crimes evidence, and renewed their objection.

¶ 32 Kriske testified that approximately a month before the incident for which defendant was standing trial, he and defendant were drinking until around three or four in the morning. At five in the morning, Kriske, along with defendant and a woman named Zoe, went to Montrose Harbor. They were drinking beer. A fisherman walked by, at whom Kriske, defendant, and Zoe waved. The fisherman went to the pier with a fishing pole in his hands. At some point, defendant left Zoe and Kriske and went to the pier to talk to the fisherman. Kriske became aggravated and left the scene. As he was leaving, he heard a splash from behind him. He saw defendant, but not the fisherman. Defendant told him that they had to go. They then went to Kriske's apartment.

¶ 33 Kriske said that after about four hours, he and defendant had a discussion and Kriske voiced his concern over what had happened. Kriske said defendant expressed remorse for his actions. Kriske and defendant then went back to Montrose Harbor. They assumed the fisherman had not been hurt because nobody was there. On cross-examination, Kriske testified that defendant laughed after he pushed the fisherman into the water.

¶ 34 Before Ronald Squires testified, defense counsel indicated that if the State did not call Ronald Squires, they would call him in their case-in-chief. Squires testified that approximately a month before the incident for which defendant was currently standing trial, he was pushed into Lake Michigan at Montrose Harbor. He testified that while he was fishing, he noticed two males and one female in the area. Later, he happened to turn around and see a person who asked him, "Do you have a light?" Squires gave the man a lighter, which the man returned. He saw the man for a second time, and noticed the man was covered in tattoos, including his arms, and there was a tattoo of a bird on the side of his neck. Squires

said that at one point the female in the group approached him and asked him questions about fishing for five minutes. While he was talking to the female, the man with the tattoos and the other man were talking farther away. After talking to the woman, he turned his back to the group and continued fishing. He then felt a push to his shoulder blade area. As he was pushed, he heard the woman say, "Oh, my God." Squires recalled that before someone pushed him, the man with the tattoos appeared nervous and "antsy."

¶ 35    Squires testified to his feelings once he was in the water, specifically, that he was in shock and found it difficult to swim with his boots on. He testified that he swam about 80 feet to the rocks on the other side. Squires testified that he "was swimming for [his] life." Once he reached the rocks, the two men and the woman were gone. A month later, a fellow fisherman called him. Based on their conversation, he went down to Montrose Harbor, where he spoke with the police regarding being pushed into the lake.

¶ 36    The State called Thao Doan, daughter of the victim. She testified that her father would often fish at Montrose Harbor and that he was 62 years old when he drowned. The parties stipulated that at 5:30 a.m. on the day of the incident, the water at Montrose Harbor was 71 degrees and that Doan's body was found 8 feet off the Harbor wall in water that was 15 feet deep.

¶ 37    The State rested its case. Defendant motioned for a directed finding, which the circuit court denied. Defendant called his mother, Ann Haley, to the stand. Ann Haley testified that defendant is a peaceful person.

¶ 38    The jury found defendant not guilty of first degree murder, but guilty of involuntary manslaughter. Defendant filed a motion for a new trial, arguing, amongst other things, that the proof of other crimes evidence was improperly admitted. The court denied defendant's motion.

¶ 39                                                    Sentencing

¶ 40    At the sentencing hearing, the State called James Lorang, Adam Katz, Adam Stein, and Thao Doan to testify in aggravation. Lorang testified to an altercation he had with defendant and another man in October of 2000. Lorang had passed defendant and the other man on the street. After he passed, defendant and the other man attacked him from behind. They kicked and punched him. After five minutes, the attack ended and defendant and the other man fled the scene. Lorang received treatment at an emergency room for his injuries. His ear bled and his forearms were bruised. Lorang lost 25% of his hearing in one ear.

¶ 41    Detective Adam Katz testified that in January of 2001, he witnessed a disturbance involving defendant in which it appeared as though a Hispanic man was fending off two white males. One of the white males was defendant, who was detained and searched. Detective Katz discovered 18 bundles of cocaine in defendant's pocket. In defendant's backpack, Detective Katz found a pill bottle with 25 tablets of paramethoxyamphetamine, a pink bag with 48 pills of PCP, and several bags of cocaine totaling 166.9 grams. Defendant pled guilty and received 4 years' probation, and 120 days in Cook County jail, based on the incident.

¶ 42    Adam Steinz testified to an incident in February of 2005, where defendant struck him

with a beer bottle and a barbell, and kicked and punched him. At the time, Steinz worked at a liquor store, where he met defendant, and offered to help him carry alcohol to defendant's friend's party. At the party, defendant invited Steinz to stay. Steinz became intoxicated. At some point, defendant and Steinz argued over defendant's use of racist language. Steinz attempted to leave the party, but defendant hit him over the head with a beer bottle. Steinz then hit defendant in the face. Defendant's friends took hold of Steinz, pinned him down, and kicked and punched him. While pinned down, defendant struck him with a barbell. Steinz managed to leave the apartment and call the police. Steinz had severe lacerations to his head, as well as bruises on his face. Defendant received misdemeanor probation for his role in the incident.

¶ 43   Thao Doan, Du Doan's daughter, read a prepared statement indicating the impact his death had on her family. She asked that defendant be punished with the maximum penalty. The State presented impact statements from Thao Doan, Ann Doan, and Kevin Doan, which indicated the heavy emotional and financial toll Du Doan's family endured.

¶ 44   Defendant presented testimony and written statements from his family. Defendant's mother testified that defendant had given up alcohol and was now married with a child. She testified his bad behavior began after he found his alcoholic father dead in 1986. The following letters were entered into evidence by defendant. Defendant's sister, Mary Haley, stated that defendant had become a better person since the incident. Defendant's wife, Regina Haley, claimed defendant gave up alcohol and is a good husband and father. Defendant, through his own statement, apologized to the Doan family and stated that he had given up alcohol.

¶ 45   Before making its ruling, the sentencing court stated on the record a long list of factors it considered in making its decision. The court noted that it had read defendant's presentence investigation report and considered defendant's past criminal conduct, the four statutory aggravation factors as argued by the State, the statutory factors in mitigation as argued by defendant, defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age, the nature and circumstances of the offense, the tentative attitude on the part of defendant or its absence thereof, the protection of the public, deterrence and punishment, defendant's rehabilitative potential, and the stimuli that caused the crime. The sentencing court also stressed that in making its decision, it considered all of the above factors in addition to the arguments of counsel, the victim impact statements, and defendant's statement.

¶ 46   The sentencing court noted the statutory factors in aggravation, as argued by the State, were whether defendant's conduct caused or threatened serious harm, defendant's history of delinquency or criminal activity, whether the sentence was necessary to deter others from committing the same crime, and whether defendant committed the offense against a person 60 years of age or older, which he had. The sentencing court remarked, "[t]hose were the four factors that at least statutorily would be for aggravation."

¶ 47   The sentencing court also commented on the statutory factors it considered in mitigation, as argued by defendant. The court considered whether defendant contemplated that his criminal conduct would cause or threaten serious harm to another, to which the court

commented, "I don't believe there's any testimony concerning that." The court analyzed whether defendant's criminal conduct was the result of circumstances unlikely to recur, but did not comment on the record regarding this factor. The court stated it did not believe that whether defendant was particularly likely to comply with probation would apply as defendant's previous probationary sentences were completed satisfactorily. The court also commented that whether defendant's imprisonment would entail excessive hardship to his dependents did apply, finding his incarceration would clearly affect his mother, wife, and child.

¶ 48    Before issuing defendant's sentence, and after listing the factors on the record it considered in both aggravation and mitigation, the sentencing court commented:

> "First and foremost, *** this was not an accident. This was an action by a young man in the prime of his life, good physical condition, who showed to everybody in this courtroom that heard this case that he has an utter lack of respect for human life.
>
> This was a cowardly act, pushing a man that he could [not] even look in the eye, pushing a man, not into a pool with a group of people around, into a lake and then took off running. And based on the testimony of the people with him, this defendant thought that it was funny.
>
> And I heard arguments saying that the defendant is a thrill seeker. That's far from the truth. A thrill seeker puts himself in danger. A coward puts others in danger.
>
> What [defendant] did to Mr. Doan and Mr. Squires was the height, the epitome of being a coward.
>
> As [he] talked to Mr. Squires, he waited until he turned his back to push him into a lake. He did not even give Mr. Doan the opportunity to hear him. He pushed him in the back.
>
> Out of all of the factors here today, I feel that it is imperative to send the sentence to [defendant] loud and clear these actions were reprehensible and should not be performed in a civilized society ***."

The sentencing court stressed further that the acts of violence committed by defendant were not isolated incidents. After considering all of the factors in aggravation and mitigation, the court sentenced defendant to 5 years' incarceration for involuntary manslaughter, with an additional 5-year extended sentence, for a total of 10 years' imprisonment. This was the maximum sentence for which defendant was eligible.

¶ 49    Defendant timely appealed.

¶ 50                                    ANALYSIS

¶ 51    Defendant argues that the circuit court erred in allowing the jury to hear evidence of his previously pushing Mr. Squires into the lake because it was unnecessary and the risk of prejudice outweighed any probative value of the evidence. Defendant further argues that the circuit court erred in sentencing him because it improperly considered that his conduct caused serious harm and failed to give proper weight to his rehabilitative potential.

¶ 52    The State responds that defendant forfeited his claims of error by failing to object at trial

-10-

and in a posttrial motion. Forfeiture aside, the State argues that the circuit court did not abuse its discretion in allowing the jury to hear the evidence of defendant's pushing Mr. Squires because it went to defendant's *modus operandi*, intent, absence of mistake, and knowledge; and that the prejudicial effect of such evidence did not outweigh the probative value of the evidence. The State argues the circuit court did not abuse its discretion in sentencing defendant as it did because the circuit court fully considered the aggravating and mitigating evidence in issuing its sentence, a sentence the State claims is proportional to defendant's actions.

¶ 53    In his reply brief, defendant contends he preserved both issues for appeal but argues in the alternative that if this court should hold that he forfeited either issue, we should review them under the plain error doctrine.

¶ 54    In order to preserve an issue for appeal, a litigant must object both at trial and in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) ("*Both* a trial objection *and* a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial." (Emphasis in original.)). The State argues that defendant has forfeited his first claim of error, that the circuit court improperly allowed the jury to hear evidence of defendant's pushing Mr. Squires. Despite the State's contentions, we hold that defendant did preserve this issue for appeal. In response to the State's pretrial motion to introduce evidence of other crimes, defendant argued that the evidence was prejudicial and not relevant where he admitted to pushing the victims in the lake in both instances. On October 22, 2009, during trial, but before the State was to introduce testimony concerning evidence of defendant's other crime, defense counsel stated, "We previously objected to the proof of other crimes coming into this case. We will continue that objection today." After trial, defendant filed a motion for a new trial arguing the circuit court erred in allowing the jury to hear evidence of his other crime. It is clear from the record that defendant properly preserved this issue for appeal and the State's argument that he is procedurally defaulted as to this issue is without merit.

¶ 55    Evidence of other crimes is not admissible to show a defendant's propensity to commit a crime. *People v. Lindgren*, 79 Ill. 2d 129, 137 (1980). This is because evidence of other crimes can overpersuade the jury, which may convict a defendant based on its belief that the defendant is of bad character and deserves punishment. *Id.* at 137. However, if the evidence of another crime is relevant, it can be introduced for any purpose other than to show the defendant's propensity to commit criminal acts. *People v. Illgen*, 145 Ill. 2d 353, 365 (1991). Relevant evidence is evidence that "has any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *Id.* at 365-66. Evidence of other crimes is admissible when "relevant to prove *modus operandi*, intent, identity, motive or absence of mistake." *Id.* at 364-65. Evidence of other crimes may also be admitted "to show *** that the act in question was not performed inadvertently, accidentally, involuntarily, or without guilty knowledge." *People v. Wilson*, 214 Ill. 2d 127, 136 (2005).

¶ 56    Other crimes evidence must "bear[ ] some threshold similarity to the crime charged." *Id.* However, less similarity between the crime charged and the evidence of other crimes is allowed when used to show any other exception other than to prove *modus operandi*. *Id.* at

140. Using other crimes evidence to prove *modus operandi* requires greater similarity between the charged offense and the prior act "because *modus operandi* refers to a pattern of criminal behavior so distinctive that separate crimes are recognized as the handiwork of the same person." *Id.*

¶ 57     In deciding whether to allow such evidence, the trial court must weigh the probative value of the other crimes evidence against its prejudicial effect. *Illgen*, 145 Ill. 2d at 365. If the probative value of the evidence is outweighed by its prejudicial effect, the trial court should exclude the evidence. *Id*. We will not reverse the circuit court's ruling on the admission of other crimes evidence absent a clear abuse of its discretion. *People v. Ward*, 2011 IL 108690, ¶ 21. "An abuse of discretion occurs when the ruling is arbitrary, fanciful, unreasonable, or when no reasonable person would adopt the trial court's view." *Id.* We must also not substitute our judgment for that of the circuit court when determining a decision within its discretion. *Illgen*, 145 Ill. 2d at 371.

¶ 58     In this case, we hold that the circuit court did not abuse its discretion by allowing the State to introduce evidence of defendant's other crime. The incidents in question bear a striking similarity. They both occurred during the early morning hours at Montrose Harbor. Based on evidence in the record, both incidents seemed to occur at dawn with limited visibility. Defendant in both instances had been out the night before drinking alcohol with friends. Defendant pushed fishermen from behind into the water. After pushing the fishermen into the water, defendant fled. In both cases, after the incident occurred, defendant laughed.

¶ 59     Our supreme court has held that evidence of another crime may be admitted for any purpose other than to show a defendant's propensity to commit criminal acts. *Illgen*, 145 Ill. 2d at 365. In this case, the evidence of defendant's prior crime is relevant to show defendant's *modus operandi*, that defendant acted intentionally rather than inadvertently, involuntarily or accidentally, and to put context to defendant's arrest. The State put forth this evidence for those purposes. It is clear from the similarity of the incidents that the evidence of defendant's previous crime shows defendant's *modus operandi*. The testimony shows a distinctive criminal pattern on defendant's part. *Wilson*, 214 Ill. 2d at 140 ("*modus operandi* refers to a pattern of criminal behavior so distinctive that separate crimes are recognized as the handiwork of the same person"). It is also clear that the evidence established defendant's motive for pushing the fishermen into the lake and that his actions were not the result of an accident or mistake. Squires testified that his back was turned and that he was pushed forcefully from behind. After being pushed, Squires testified, the man pushing him was gone. The same steps led to Doan's drowning in this case.

¶ 60     It is also clear from our review of the record that the circuit court weighed the evidence's probative value against its potential prejudice against defendant before admitting it. See *Illgen*, 145 Ill. 2d at 365 (in deciding whether to allow such evidence, the trial court must weigh the probative value of the other offense evidence against the prejudicial effect of that evidence). The circuit court's determination that the evidence's probative value outweighed any prejudice against defendant was not an abuse of discretion. The testimony helped to explain how defendant committed the crime against Doan as the evidence of his prior crime was substantially similar to the one at bar. We cannot say that the circuit court's ruling was "arbitrary, fanciful, unreasonable," or that "no reasonable person would adopt the trial court's

view." *Ward*, 2011 IL 108690, ¶ 21.

¶ 61    Defendant next argues that the circuit court erred in sentencing him as it did because the circuit court considered an improper aggravating factor and failed to give proper weight to defendant's rehabilitative potential. The State responds that defendant is procedurally defaulted from raising these issues before this court for failing to file a written posttrial motion according to Illinois Supreme Court Rule 605(a)(3). Ill. S. Ct. R. 605(a)(3) (eff. Oct. 1, 2001). Illinois Supreme Court Rule 605(a)(3) provides in relevant part:

        "B. that prior to taking an appeal, if the defendant seeks to challenge the correctness of the sentence, or any aspect of the sentencing hearing, the defendant must file in the trial court *** a written motion asking to have the trial court reconsider the sentence imposed, or consider any challenges to the sentencing hearing, setting forth in the motion all issues or claims of error regarding the sentence imposed or the sentencing hearing;

        C. that any issue or claim of error regarding the sentence imposed or any aspect of the sentencing hearing not raised in the written motion shall be deemed waived." Ill. S. Ct. R. 605(a)(3) (eff. Oct. 1, 2001).

In this case, the record shows that on December 11, 2009, defendant filed a motion to reconsider his sentence. In his motion, defendant argued his sentence was excessive, claiming the court failed to consider that the Illinois Constitution requires consideration of the objective of restoring defendant to useful citizenship or other factors in mitigation. Defendant did not argue in his motion that the circuit court considered an improper aggravating factor. Rule 605(a)(3) clearly states that defendant must set "forth in the motion all issues or claims of error." Ill. S. Ct. R. 605(a)(3) (eff. Oct. 1, 2001). Accordingly, defendant has not waived his contention that the circuit court failed to give his rehabilitation potential proper weight. However, defendant did waive his contention that the circuit court considered an improper aggravating factor by his failure to raise this issue in his motion to reconsider his sentence.

¶ 62    We may review defendant's waived argument only if he sustains his burden of persuasion under the plain error doctrine. *People v. Herron*, 215 Ill. 2d 167, 187 (2005). The second prong of the plain error doctrine allows a court of review to reach a forfeited claim of error "where the error is so serious that the defendant was denied a substantial right." *Id*. at 178-79; see also Ill. S. Ct. R. 615(a) ("Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court."). Review of whether the circuit court improperly considered a factor in aggravation under the second prong of the plain error doctrine is proper, as it affects a fundamental right, defendant's right to liberty. *People v. Martin*, 119 Ill. 2d 453, 458 (1988). However, before addressing whether defendant's claim satisfies the plain error doctrine, defendant "must first show that a clear or obvious error occurred." *People v. Hillier*, 237 Ill. 2d 539, 545 (2010).

¶ 63    The Illinois Constitution requires that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. The trial judge, however, is given great discretion in determining a sentence within the limits set by the legislature by statute. *People v. Fern*,

189 Ill. 2d 48, 53 (1999). The trial court is in the best position to weigh the evidence and to assess the credibility of the witnesses. *People v. Jones*, 168 Ill. 2d 367, 373 (1995). This determination must be based "on the particular circumstances of each case, considering such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *Fern*, 189 Ill. 2d at 53. A trial court must balance the goals of retribution and rehabilitation of the defendant when determining a sentence. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002).

¶ 64 A defendant's potential for rehabilitation is not given greater weight than the seriousness of the crime. *People v. Coleman*, 166 Ill. 2d 247, 261 (1995). The trial court is not "required to make an express finding that defendant lacked rehabilitative potential." *Quintana*, 332 Ill. App. 3d at 109.

¶ 65 The trial court's discretion, however, "is not unfettered." *People v. O'Neal*, 125 Ill. 2d 291, 297 (1988). Under Supreme Court Rule 615, a court of review has the power to reduce a defendant's sentence if the sentence was unlawful or an abuse of the trial court's discretion. Ill. S. Ct. Rs. 615(b)(1), (b)(4); *Jones*, 168 Ill. 2d at 378. In reviewing a defendant's sentence, this court "must proceed with great caution and must not substitute its judgment for that of the trial court merely because it would have weighed the factors differently." *Fern*, 189 Ill. 2d at 53. If a sentence is within the statutory limits, a court of review will not alter that sentence unless the trial court abused its discretion. *People v. Coleman*, 166 Ill. 2d 247, 258 (1995). Further, "[a] sentence within statutory limits will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *Fern*, 189 Ill. 2d at 54.

¶ 66 Defendant first argues that it was improper for the circuit court to consider, as an aggravating factor, that defendant's conduct caused or threatened serious harm. He relies on our supreme court's decision in *People v. Martin* to argue that it is improper to consider the occurrence of death in a conviction for involuntary manslaughter as death is inherent in the offense. *Martin*, 119 Ill. 2d at 455. To put *Martin* into context, we will first look at *People v. Saldivar*, 113 Ill. 2d 256 (1986), as our supreme court in *Martin* addresses *Saldivar* in its decision.

¶ 67 In *Saldivar*, our supreme court addressed whether it was improper for a sentencing judge to consider, as a factor in aggravation, that defendant's conduct threatened serious harm. *Saldivar*, 113 Ill. 2d at 260. The defendant in *Saldivar* had been convicted of voluntary manslaughter. The court stated:

"Sound public policy demands that a defendant's sentence be varied in accordance with the particular circumstances of the criminal offense committed. Certain criminal conduct may warrant a harsher penalty than other conduct, even though both are technically punishable under the same statute. Likewise, the commission of any offense, regardless of whether the offense itself deals with harm, can have varying degrees of harm or threatened harm. The legislature clearly and unequivocally intended that this varying quantum of harm may constitute an aggravating factor. While the classification of a crime determines the sentencing range, the severity of the sentence depends upon the *degree of harm* caused to the victim and as such may be considered as an aggravating

-14-

factor in determining the exact length of a particular sentence, *even in cases where serious bodily harm is arguably implicit in the offense for which a defendant is convicted.*" (Emphasis in original.) *Saldivar*, 113 Ill. 2d at 269.

In *Saldivar*, our supreme court held that the sentencing court erred in considering, as a factor in aggravation, that defendant's conduct threatened serious harm to the victim because "the circuit court focused primarily on the end result of the defendant's conduct, *i.e.*, the death of the victim, a factor which is implicit in the offense." *Id.* at 272. The supreme court stressed that the circuit court's findings were "not directed at the degree or gravity of the defendant's conduct, *i.e.*, the force employed and the physical manner in which the victim's death was brought about or the nature and circumstances of the offense." *Id.* at 271-72.

¶ 68 In *Martin*, the defendant was convicted of involuntary manslaughter and sentenced to the maximum statutory penalty, five years' incarceration. *Martin*, 119 Ill. 2d at 455. Our supreme court explained the reasoning used by the sentencing court, before holding that considering the victim's death as an aggravating factor was improper:

"Before imposing the sentence [the sentencing court] explicitly stated that 'in committing the felony the defendant inflicted serious bodily injury to another resulting in death.' In addition, the judge added the phrase 'resulting in death' to the signed document on which he indicated the aggravating factors he considered in imposing the sentence. But even if we were to disregard these statements, it remains abundantly clear that the trial court focused solely on the victim's death in sentencing defendant since there was no extreme degree of harm the court could have considered. The defendant's gun was unintentionally discharged, firing a single shot which killed the victim. The degree of force–the brutality–which, as we observed in *Saldivar*, might justify an increased sentence even though death is implicit in the offense, simply is not present in this situation. For these reasons, we conclude that the trial judge improperly considered the victim's death as an aggravating factor in sentencing the defendant." (Emphasis omitted.) *Martin*, 119 Ill. 2d at 461 (citing *Saldivar*, 113 Ill. 2d at 269).

¶ 69 Unlike the sentencing courts in *Saldivar* and *Martin*, the sentencing court in the case at bar did not focus its decision primarily on the victim's death. The sentencing court did not even mention the term "death" in making its ruling. It did mention, in addressing the State's argument that defendant's conduct caused or threatened serious harm, that it was one of "four factors that statutorily would be for aggravation." However, the sentencing court did not improperly focus on the harm caused in issuing its sentencing ruling. Rather, the sentencing court's comments show that it properly considered, not Doan's death, but the brutality of the circumstances of defendant's crime, in sentencing defendant as it did. See *Martin*, 119 Ill. 2d at 461 ("[t]he degree of force–the brutality–*** might justify an increased sentence even though death is implicit in the offense"). The sentencing court properly considered the brutality of defendant's actions in pushing a man into a lake from behind, fleeing, and then laughing about his actions. The court found defendant's actions "reprehensible." Instead of focusing on the victim's death in this case, which would have been improper, it is clear the sentencing court addressed the force and manner in which defendant committed the crime, proper considerations in determining the appropriate sentence.

¶ 70 Additionally, unlike in *Saldivar* and *Martin*, the sentencing court considered many factors in making its decision. The transcript of its ruling is lengthy and addresses defendant's presentence investigation report, his past criminal conduct, statutory factors in aggravation and mitigation, his credibility, demeanor, general moral character, mentality, social environment, habits and age, the nature and circumstances of the offense, the tentative attitude on the part of defendant or absence thereof, the protection of the public, deterrence and punishment, defendant's rehabilitative potential, and the stimuli that caused the crime. This was in addition to the arguments of counsel, victim impact statements, and defendant's own statement.

¶ 71 We hold that, although the sentencing court mentioned that the degree of harm caused by defendant's actions was one of "four factors that statutorily would be for aggravation," the court's ruling shows that it properly analyzed this factor in terms of the degree of force defendant used in committing the offense, as opposed to the outcome of defendant's action, the victim's death. The sentencing court considered the brutality of defendant's conduct and the circumstances of the crime, which is proper under both *Martin* and *Saldivar*. *Martin*, 119 Ill. 2d at 461 ("The degree of force–the brutality–*** might justify an increased sentence even though death is implicit in the offense ***."); *Saldivar*, 113 Ill. 2d at 271-72.

¶ 72 The record shows the sentencing court did not improperly focus on the victim's death in making its decision. Rather, the sentencing court considered many factors in light of the facts and circumstances of this particular case in crafting a proper sentence. The three other statutory factors in aggravation which the court considered–defendant's past criminal activity, deterrence, and the victim's age–are sufficient to support the sentence. This is a sentence perfectly justified for the offense.

¶ 73 Defendant's final argument is that his sentence is excessive in light of his claims that the sentencing court failed to give proper weight to his rehabilitative potential. We disagree. The sentencing court specifically stated on the record that defendant's rehabilitative potential was one of the factors it considered in making its decision. We note that in conducting our review, it is not proper for us to substitute our judgment for that of the sentencing court simply because we may have weighed the various factors differently. *Fern*, 189 Ill. 2d at 53. We also note that a defendant's potential for rehabilitation is not given greater weight than the seriousness of the crime nor is the sentencing court required to expressly state that a defendant lacked rehabilitative potential. See *Coleman*, 166 Ill. 2d at 261; *Quintana*, 332 Ill. App. 3d at 109 (the trial court is not "required to make an express finding that defendant lacked rehabilitative potential"). The record shows defendant's rehabilitative potential was a factor the sentencing court considered. That the sentencing court appeared to place more weight on the fact that defendant had a lengthy criminal record, which included several instances of violent conduct, was not improper. We hold the sentencing court did not abuse its discretion when it sentenced defendant.

¶ 74                                          CONCLUSION

¶ 75 The judgment of the circuit court is affirmed.

¶ 76    Affirmed.