NOTICE
This Order was filed under
Supreme Court Rule 23 and
is not precedent except in the
limited circumstances
allowed under Rule 23(e)(1).

2021 IL App (4th) 190289-U

NO. 4-19-0289

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 13, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| QUENTIN SCHERTZ, | ) | No. 16CF234 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jennifer H. Bauknecht, |
| | ) | Judge Presiding. |

_____

JUSTICE HOLDER WHITE delivered the judgment of the court.
Justices Cavanagh and Harris concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The appellate court affirmed, concluding (1) the State proved defendant guilty beyond a reasonable doubt, (2) defendant waived any challenge to the imposition of consecutive sentences, and (3) the trial court did not abuse its discretion in imposing an aggregate 74-year sentence.

¶ 2     Following a 2018 bench trial, the trial court found defendant, Quentin Schertz, guilty of (1) predatory criminal sexual assault (720 ILCS 5/11-1.40(a)(1) (West 2012)) (count I), (2) criminal sexual assault (720 ILCS 5/11-1.20(a)(3) (West 2012)) (count II), (3) aggravated criminal sexual abuse (720 ILCS 5/11-1.60(b) (West 2012)) (count III), and (4) indecent solicitation of a child (720 ILCS 5/11-6(a) (West 2012)) (count IV).  In March 2019, the court merged count II into count I and sentenced defendant to 60 years' imprisonment for predatory criminal sexual assault, consecutive to a 7-year sentence for aggravated criminal sexual abuse, and consecutive to a 7-year sentence for indecent solicitation of a child.

¶ 3    Defendant appeals, arguing (1) the State failed to prove him guilty beyond a reasonable doubt, (2) the trial court erred in imposing consecutive sentences, and (3) the court abused its discretion in sentencing him to an excessive aggregate sentence of 74 years' imprisonment. We affirm.

¶ 4    I. BACKGROUND

¶ 5    In October 2016, the State charged defendant with (1) predatory criminal sexual assault where defendant allegedly penetrated the anus of K.S. with his penis between January 1, 2013, and December 31, 2013 (720 ILCS 5/11-1.40(a)(1) (West 2012)) (count I); (2) criminal sexual assault where defendant allegedly committed an act of sexual penetration with K.S., a family member and person under 18 years of age, between January 1, 2013, and December 31, 2013 (720 ILCS 5/11-1.20(a)(3) (West 2012)) (count II); (3) aggravated criminal sexual abuse where defendant allegedly "forced K.S. to pose nude while he masturbated and touched the breasts of K.S., for the purpose of sexual gratification" between May 1, 2016, and May 30, 2016 (720 ILCS 5/11-1.60(b) (West 2012)) (count III); and (4) indecent solicitation of a child where defendant allegedly "knowingly solicited a child, Z.S., to perform an act of sexual conduct or penetration upon K.S., a family member under the age of 18[,]" between January 1, 2008, and December 31, 2010 (720 ILCS 5/11-6(a) (West 2012)) (count IV). The State filed the charges after K.S. and Z.S. were interviewed on October 9, 2016, at the Child Advocacy Center in Pontiac, Illinois, and alleged their father, defendant, sexually abused them over a period of years. Defendant waived his right to a jury trial and elected to proceed to a bench trial.

¶ 6    A. Defendant's Bench Trial

¶ 7    Below, we summarize the relevant testimony elicited during defendant's bench trial, held over three days in April, October, and November 2018.

¶ 8                                    1. *Z.S.*

¶ 9            Z.S. testified he was born on May 19, 2003, and at the time he testified he was 14 years old and in eighth grade. Z.S. currently resided with his mother, K.S. (his sister), and Chadwick Brown (Chad), his mother's boyfriend. Z.S. stated his father, who he identified as defendant in court, lived in the home before his arrest. Chad came to live with them shortly after his father's arrest. Z.S. lived in the same house in Pontiac his entire life, other than a brief period of time during which he lived in a trailer park.

¶ 10           Z.S. testified that starting in 2008, when he was five years old, to 2016, he witnessed defendant touch K.S. in a sexual way several times in multiple locations in the house, including in K.S.'s bedroom, their mother's room, and in the basement. Z.S. specified these interactions occurred mostly at night while his mother worked. Z.S. testified that other than him, no one else was present when defendant performed sexual acts on K.S. When asked specifically what he witnessed defendant doing to K.S., Z.S. responded, "Basically like humping" and "[b]asically like having sex with her." Z.S. stated defendant and K.S. were not wearing any clothes during the encounters.

¶ 11           Z.S. also testified he performed a "humping motion" on K.S. with defendant watching and masturbating. Z.S. stated that during the encounters with K.S. they were both naked, and Z.S.'s penis touched K.S.'s vagina. Z.S. testified that, early on, defendant told him if he told anyone about the sexual encounters, Z.S. would be taken away from his family and never see them again. Z.S. testified when he was younger, he did not know what they were doing was wrong.

¶ 12           On cross-examination, Z.S. testified defendant was the disciplinarian in the house and defendant would give spankings or take away electronics. Z.S. testified he never heard K.S.

threaten to call the Department of Children and Family Services (DCFS) if defendant took her electronics away. Z.S. stated when he was five or six years old, he watched porn with defendant. Z.S. never watched porn with his cousin, B.C. Z.S. testified he remembered a time he was in the backyard camper with K.S. and B.C. when he and K.S. simulated sexual activity. Z.S. testified B.C. maybe touched K.S.'s private areas but he mainly just watched. Z.S. testified he and K.S. only had sex once or twice, with one time being in the camper. Z.S. stated, "We would *** like [experiment] what we learned from him."

¶ 13 When asked if he remembered being interviewed by a woman at the Child Advocacy Center in October 2016 about the incidents with defendant and K.S., Z.S. responded, "Yes." Z.S. did not remember telling the woman in the October 2016 interview that defendant "had done things with" him, K.S., and B.C. Z.S. also did not remember stating in the October 2016 interview that the sexual encounters began when he lived at the trailer park. Z.S. testified they moved out of the trailer park when he was three years old and the sexual encounters began when he was five. Z.S. testified defendant moved out of the house at one point and lived with Z.S.'s grandparents. Z.S. stated when he and K.S. went to visit their dad at his grandparents nothing happened at their home.

¶ 14 Z.S. testified defendant positioned himself behind K.S. and on top of K.S. when defendant put his penis in K.S.'s vagina. Z.S. never saw defendant put his penis in K.S.'s anus. Z.S. estimated he was nine years old the last time something happened between himself, K.S., and defendant. Z.S. clarified that defendant kept on doing it with K.S. until Z.S. was 13 years old. Z.S. testified nothing ever happened at his Aunt Elizabeth's house. Further, Z.S. testified he never told his mother or any teachers about the sexual encounters.

¶ 15 2. *K.S.*

¶ 16     K.S. testified she was born on September 10, 2001, and at the time she testified she was 17 years old and in eleventh grade.  K.S. identified defendant as her father in court and testified she used to live with him.  K.S. testified that, starting when she was five years old, defendant had her pose with her clothes off while defendant masturbated.  K.S. began puberty at nine years old, and defendant started using his penis with her.  K.S. described an occasion in her grandparents' attic when defendant rubbed his penis on her vagina.  K.S. described another occasion at her house where K.S. and defendant were in the basement when defendant put his penis in K.S.'s "butt."  Specifically, K.S. testified defendant would pose her and then he would touch her.

¶ 17     K.S. testified she stopped posing for defendant when she was around 15 years old and "started rebelling."  K.S. testified the last time something happened between her and defendant was in May 2016 in her bedroom when defendant put his penis in her "butt."  K.S. also stated, "[Defendant] groped my boob, and he grabbed me by the wrist and stuff because I wasn't cooperating."  K.S. described when defendant put his penis inside of her, he "was moving back and forth."

¶ 18     K.S. testified defendant also would make Z.S. put his penis on her vagina.  K.S. stated it began when she and Z.S. were younger and Z.S. had not yet hit puberty.  When asked how many times defendant had her and Z.S. do anything together, K.S. responded, "Not that many times.  Probably ten or more."  K.S. testified the sexual encounters between her and Z.S. occurred at their house and at her Aunt Elizabeth's house.  K.S. testified she and Z.S. had sexual encounters less than the times she and defendant had sexual encounters.  K.S. stated the sexual encounters with Z.S. became less frequent as they got older "[b]ecause my dad wanted me to

himself." Further, K.S. testified that during the sexual encounters between K.S. and Z.S., defendant masturbated and told Z.S what to do.

¶ 19　　　K.S. testified defendant threatened her regarding what would happen if she told anyone about the encounters. Specifically, K.S. stated, "He said he would kill my mom and that I would be alone if I told anyone and everyone would leave me and I would be in a foster home." K.S. estimated defendant put his penis inside of her on 10 or fewer occasions. K.S. also disclosed an incident that involved her cousin, B.C. K.S. testified B.C. was the same age as Z.S. K.S. also described an incident in which defendant made her pose but that she had to rush to put on her clothes when her grandfather walked in and told her to put her clothes on.

¶ 20　　　On cross-examination, K.S. testified she did not recall telling Jo Sipes at the Children's Advocacy Center in October 2016 that the last time respondent put his penis in her butt was when she was 12 years old. K.S. testified she initially disclosed the sexual encounters with defendant to Mr. Flott at school. K.S. did not recall if she told Mr. Flott that the last time anything happened with defendant was when she was 13 years old.

¶ 21　　　K.S. testified to over 100 incidents of sexual contact with defendant which involved her posing and him rubbing against her. K.S. estimated her mom was at home sleeping when about half of the occurrences happened between her and defendant. K.S. testified defendant would discipline her by smacking her or taking away her electronic devices. K.S. did not remember ever telling defendant she would call DCFS if he took her electronic devices away. However, K.S. testified she threatened to call DCFS when defendant hit Z.S. K.S. stated she was scared of defendant and did not like being around him. K.S. did not remember telling defendant that she wanted to live with him if her parents got divorced. K.S. admitted she sat on

defendant's lap and would hug him in social settings. K.S. testified Chad moved into their house about a month or two after defendant left.

¶ 22 K.S. testified about two sexual encounters where it was just her, Z.S., and B.C. Specifically, once at her aunt's house and another in the camper. Later, K.S. testified she did not remember if anything happened between her and Z.S. in the backyard camper. K.S. remembered being in the camper with Z.S., B.C., and defendant where defendant forced Z.S. to rub his penis on K.S.'s vagina and B.C. watched. K.S. testified that B.C. touched her private parts in a camper at her aunt's house. When asked if K.S. remembered telling Jo Sipes in the October 2016 interview that B.C. tried to put his penis against her vagina, K.S. testified, "I don't remember that much about Sipes." K.S. further testified Z.S. was not around much when defendant put his penis in her "butt."

¶ 23 On redirect examination, K.S. testified that one of the first people she told about the sexual conduct was her friend, Alex. K.S. stated that she told Alex because "she didn't like my dad; and she always thought he was creepy. And then she told me about her dad and stuff and that she got help[.]"

¶ 24                                   3. *Karen S.*

¶ 25 Karen S., K.S. and Z.S.'s mother, testified that in March 2006, her family moved into the house in Pontiac. In the later part of 2008, defendant moved out of the house and moved in with his parents. Karen S. testified defendant lived with his parents for about three years until he moved back into the house. Defendant moved out of the home after his arrest in 2016. Karen S. testified defendant was the "primary disciplinarian" because he "was home all the time." In 2008, Karen S. worked nights.

¶ 26    Karen S. testified that prior to October 2016, she didn't think anything sexual was going on with K.S. and defendant but "I just knew that she was uncomfortable sometimes around him." In October 2016, K.S. reported the abuse to her school counselor, Jeff Flott. Karen S. testified that prior to K.S. disclosing the abuse, she observed defendant squeeze K.S.'s butt and that "he would like hug her tight; and she didn't like it." Karen S. also testified defendant would adjust K.S.'s clothes and touch her boobs. Karen S. stated she told defendant "he shouldn't do it. That's inappropriate." Karen S. testified she currently resided at her house with K.S., Z.S., and Chad. Karen S. stated Chad first stayed at the house about two months after defendant's arrest.

¶ 27                    4. *Jeffrey William Flott*

¶ 28    Jeffrey William Flott, a school guidance counselor at Pontiac Township High School, testified that on October 5, 2016, K.S. told him about the sexual abuse by defendant. Flott testified he believed K.S. said that she was about 13 years old the last time defendant sexually abused her. However, Flott indicated that part of the conversation was not "clear" to him. Flott stated he looked at a DCFS report, and "that's what they said so I'm pretty confident that that's accurate." On cross-examination, Flott admitted he was not sure how old K.S. was when the abuse stopped and he did not write the DCFS note. Flott did not have any recollection of what K.S. said about when the abuse last occurred.

¶ 29                    5. *B.C.*

¶ 30    B.C. testified K.S. and Z.S. were his cousins and defendant was his uncle. At the time he testified, B.C. was 15 years old and in ninth grade. B.C. testified that he and Z.S. were the same age and K.S. was a little bit older. B.C. stated when he was around 11 or 12 years old, he and Z.S. watched pornography at Z.S.'s house. B.C. also testified that around that time he was in the camper with K.S. and Z.S. B.C. recalled being in the camper late one night when K.S.

asked Z.S. if he "wanted to mess around, and [Z.S.] said sure." B.C. testified Z.S. and K.S. got into bed together underneath the covers but he then turned around and went to sleep. B.C. denied defendant was present. B.C. testified he never witnessed defendant do anything sexually inappropriate with K.S. or Z.S. B.C. also denied he did anything of a sexual nature with K.S.

¶ 31 On cross-examination, B.C. admitted that in October 2016 he talked to an interviewer in Pontiac about the camper incident with K.S. and Z.S. B.C. acknowledged he told the interviewer that he was worried there were things he had forgotten. B.C. agreed he told the interviewer he was "still trying to figure out exactly what had happened." B.C. said he was not sure if K.S. and Z.S. were lying or telling the truth. When asked if he had a good memory, B.C. responded, "There's some things I do forget." B.C. testified his mother's name is Elizabeth and he never spoke with her about what happened in the camper.

¶ 32                                   6. *Detective Michael Henson*

¶ 33 Michael Henson, a detective with the Pontiac Police Department, testified that in November 2008 he observed K.S.'s interview with Jo Sipes at the Advocacy Center in Pontiac. When asked what allegations brought K.S. in to be interviewed, Detective Henson stated, "I believe it came in from DCFS for a risk of sexual abuse where [K.S.] had been acting out and putting stuff in her butt and that kind of thing." Detective Henson testified K.S. made no disclosures at the time. Detective Henson also observed K.S.'s October 2016 interview with Jo Sipes. In the October 2016 interview, Detective Henson remembered K.S. saying that she was 13 years old the last time something happened between her and defendant. Detective Henson testified K.S. also said she was probably around 12 years old the last time defendant put his penis in her butt. Detective Henson stated that when K.S. described the May 2016 incident with defendant, she did not say anything about defendant putting his penis in her butt. Rather, K.S.

alleged defendant sat in a chair with his legs spread and his pants down and masturbated while he had her on the bed naked and in different positions. Detective Henson testified K.S. told Jo Sipes the encounters with defendant occurred at her house and her grandparents' house. K.S. told Jo Sipes her mother was home asleep during some of the sexual encounters with defendant.

¶ 34        Detective Henson also observed Z.S.'s October 2016 interview with Jo Sipes. Detective Henson testified that Z.S. described to Jo Sipes how defendant positioned K.S. when having sex with her. Detective Henson also testified Z.S. stated in the interview the last time "something happened" was six to seven months prior to the October 2016 interview.

¶ 35                              7. *Kenneth Earl Schertz*

¶ 36        Kenneth Earl Schertz, defendant's father, testified that starting in 2008 defendant lived at his house for two years. Kenneth testified K.S. and Z.S. were his grandchildren and, when defendant lived in his house, K.S. and Z.S. spent the night at his house every other weekend. Kenneth stated when the children spent the night, K.S. slept downstairs in the room across from his wife and him and defendant and Z.S. slept upstairs in the attic in separate beds. Kenneth denied he ever walked upstairs and yelled at K.S. to put her clothes on. Kenneth testified that about a week before defendant's arrest, he was in defendant's living room and K.S. threatened to call DCFS if defendant took her electronics away for receiving bad grades. On cross-examination, Kenneth admitted that in November 2016, he spoke with Detective Henson but he did not tell Detective Henson that K.S. threatened to call DCFS regarding defendant.

¶ 37                              8. *Trial Court's Verdict*

¶ 38        At the close of trial, the trial court gave a lengthy oral pronouncement where it noted this was a difficult case which boiled down to the credibility of K.S. and Z.S. The court first addressed the credibility of B.C. The court found B.C. to be a "very credible witness" but

noted B.C.'s lack of recall of the incidents from when he was "very young" did not mean that K.S. and Z.S. were lying. The trial court opined, "It is very possible that [B.C.] doesn't remember or just can't face it or that it did happen or that it never happened." The court explained that even if the "two or three incidents" with B.C. never happened, it did "not mean that every single thing that [Z.S.] and [K.S.] testified to never happened." The court concluded that despite it finding B.C. credible, it was "very possible that he simply could not recall it or could not face it as an alternative to him coming in here and saying yes, it did happen."

¶ 39          As to Z.S.'s credibility, the court found his testimony "fairly consistent[.]" The court remarked that Z.S. witnessed defendant touch K.S. for an extended period of time. Z.S. testified "to specifics, and I think there was reference to that, that he saw the [d]efendant having sex with [K.S.]; and I thought he described that in pretty fairly great detail." The court acknowledged some inconsistencies between Z.S.'s recollection and K.S.'s recollection but stated "[s]ome of that can be based upon their respective ages at the time that this occurred." Overall, the court stated that "they were very consistent with the core allegations in this case." The court pointed out it believed Z.S. would have been unable to tell whether defendant penetrated K.S.'s vagina or anus, based on Z.S.'s young age and angle of viewing.

¶ 40          The trial court remarked that the questions about defendant being the disciplinarian at home "went right over [Z.S.'s] head." Specifically, Z.S. failed to see the connection to the topic as it related to the sexual activity. The court concluded, "[T]hat kind of shows you that innocence that you are talking about, the sincerity, the genuineness of what [Z.S. is] telling you." The court found Z.S.'s "very lengthy" testimony to be "pretty consistent" where he used age-appropriate words to describe the sexual activity. Further, the court found Z.S.'s demeanor while testifying "was very timid and quiet, but it was also wholly appropriate

- 11 -

considering the subject matter." Z.S. answered the questions without "seeming to make anything up or exaggerate." Based on his age and the nature of the difficult subject matter, the court stated Z.S. handled himself "pretty well." The court found Z.S. to be "a very credible witness."

¶ 41    As to K.S.'s credibility, the court found K.S. provided a "considerable amount of detail concerning the specific instances including how they were positioned, where their clothes were, [and] what areas of her body he was having contact with." The court noted it would expect children at that age to "remember those types of details," but the court "would not expect them to come in here and say, yes, yes, I was 12 years old the last time this happened. I was 15 years old the last time this happened. I was five years old the first time this happened." The court disagreed that K.S.'s testimony was diminished when the activity went on for eight years and K.S. could not remember how old she was when specific things happened.

¶ 42    The court opined K.S. appeared to be "pretty timid" and "she was pretty quiet during her testimony." The court found K.S. to be "most sincere" when she "discussed how this came out." The court determined K.S. to be "a very credible witness." Specifically, the court stated, "She did not have any inconsistencies, and her credibility was corroborated by Z.S. The court did not see K.S. and Z.S. making up such horrific allegations "because they don't want to lose their Xbox."

¶ 43    As to the allegation K.S.'s grandfather walked in on her and defendant, the court stated, "So just because her recollection of that incident may have been different than grandpa's recollection of that incident doesn't mean that all of this other stuff was going on in the home didn't happen." As to the camper incident involving B.C., K.S., and Z.S., the court remarked "the fact of the memory as to that incident between these three kids, primarily two kids at different ages at the time this is happening really does not cause me to think that this did not

happen." The court also found little weight to the argument about why K.S. and Z.S. did not disclose the abuse sooner. The court stated, "It takes a tremendous amount of strength for a child especially in this position I would say to be able to come forward, and I don't think that again necessarily means that something didn't happen."

¶ 44 The court determined Flott failed to provide any impeachment because he could not personally remember what K.S. stated. As to Karen S., the court found she did not "offer much." The court believed Karen S.'s testimony that she was "suspicious" lent "more credibility to what was going on." The court added, "The fact that DCFS didn't figure it out during an investigation doesn't surprise me and doesn't mean it didn't happen." The court also remarked that Detective Henson did not necessarily impeach K.S. and J.S. because of the difference in the way that questions were asked in open court compared to the Child Advocacy Center interviews. Based on the evidence, the court found the defense's witnesses did not cast "any doubt" on the credibility of the State's witnesses. Ultimately, the court found defendant guilty of all four counts.

¶ 45 B. Defendant's Posttrial Motions and Sentencing Hearing

¶ 46 On December 7, 2018, defendant filed a posttrial motion asserting the State failed to prove defendant guilty beyond a reasonable doubt and questioning the trial court's credibility determinations. On December 11, 2018, defendant filed a motion to reopen evidence based upon newly discovered evidence and reconsider verdict. The motion alleged that in October 2018, S.C., an acquaintance of Z.S., told her mother that Z.S. told her "that his mother was paying him to testify falsely against his father herein." The trial court granted the motion to reopen evidence and set the motion for an evidentiary hearing.

¶ 47        At a February 2019 evidentiary hearing, defense counsel called S.C. to testify.

S.C. testified she was 16 years old and that in September 2018, she became friends with Z.S.

Defense counsel asked S.C. if she remembered a December 2018 interview where she disclosed

that Z.S. told her his father had a court date because his father did sexual things to K.S.  S.C.

responded, "I did not recall that until this current time."

¶ 48        Defense counsel also asked S.C. if she recalled a time when she was in Z.S.'s

bedroom with him and she asked him how he was involved in the case with defendant and Z.S.

told her "he was being paid by his mother to lie about what happened in this case[.]"  Over

objection, S.C. responded, "I don't remember exactly what was said."  Defense counsel later

asked S.C. if she remembered Z.S. stating in his bedroom that his mother wanted him to lie about

the case so that she could move her boyfriend Chad into the home.  S.C. responded, "I don't

know.  Chad was living there."  S.C. then testified, "I'm sorry.  I don't know.  I told you I didn't

know before you came in here, but you told me I was lying."  Defense counsel denied telling

S.C. she was lying and again asked her, "Do you remember [Z.S.] telling you that his mother

wanted him to lie about this so that she could move her boyfriend Chad into the house?"  S.C.

responded, "No, I don't."

¶ 49        After S.C.'s testimony, defense counsel offered a proffer that Anthony Matens's

testimony would impeach S.C.'s testimony.  Specifically, if called as a witness Matens would

testify that in December 2018, he interviewed S.C. who told him that Z.S. told her one day in his

bedroom that his mother wanted him to lie about defendant's case so she could move her

boyfriend Chad into the house.

¶ 50        After a short recess where the court reviewed her notes, the court determined that

even if S.C. were to be believed, S.C. "did not tell me anything that would cause me to find that

[Z.S.] was not credible. I simply cannot do that based upon an impeachment witness who offered nothing." The court found the most logical explanation to Z.S.'s statement about his mother paying him off is that Z.S. panicked and gave "a very unfortunate answer" in response to S.C. "just to make it go away." The court concluded it continued to believe K.S. and Z.S. were credible. Ultimately, the court affirmed its finding of guilty on all four counts.

¶ 51    At a March 2019 hearing, the trial court first denied defendant's December 7, 2018, posttrial motion finding the "evidence overwhelmingly supports the court's finding" and held a sentencing hearing. During the sentencing hearing, the court in discussing the sentencing ranges with both parties stated, "So Count 1 is six to 60. Count 2 to merge with Count 1. Counts 3 and 4 are three to seven consecutive to each other and consecutive to Count 1. So all three counts are consecutive, and Count 2 merges." Both parties responded, "Yes." The court then admitted victim impact statements filed in December 2018.

¶ 52    The State recommended defendant receive the maximum aggregate sentence of 74 years in prison. Defense counsel recommended, "With regard to Count 1, I believe that a sentence of six years at 85% is appropriate. Count 2 merges with Count 1 and Counts 3 and 4 I would argue that a three-year sentence on each one of those consecutive to each other and consecutive to Count 1 would be the appropriate sentence. That is going to result in [defendant] being incarcerated for somewhere close to nine years by my calculations." Defense counsel clarified counts 1, 3, and 4 "have to be consecutive, so I believe that serving a sentence, a 12-year sentence will result in him serving nine years; and I believe that's the appropriate sentence."

¶ 53    The trial court stated, "So to begin with, I am going to enter a judgment of conviction on Count 1 for the Class X felony offense of predatory criminal sexual assault of a

child.  I will show Count 2 is merged with Count 1.  Conviction is entered on Count 3 for the Class 2 felony offense of aggravated criminal sexual abuse and Count 4 again a Class 2 felony offense of indecent solicitation of a child."  Further, the court stated, "I do believe the statute does require the court to run Counts 1, 3, and 4 consecutive to each other.  That means there must be a minimum sentence of 12 years.  There is a maximum sentence of 74 years."

¶ 54    In reaching its decision, the trial court stated it took into consideration the evidence at trial, the presentence report, the victim impact statements, and the relevant statutory factors, including the factors in aggravation and mitigation and rehabilitative potential.  The court found this was not an isolated incident on defendant's part but rather this spanned over an extended period of time and involved more than one victim.  The court stated defendant held a "position of trust" over the children as their father and took advantage of that position.  The court also commented on the courage K.S. and Z.S. displayed in testifying, given the nature of the abuse.  The court noted the evidence alone rendered "this as one of the most extreme cases of predatory criminal sexual abuse."  As a result, the court found defendant's conduct in this case caused serious harm to the children and they will most likely deal with that trauma for the rest of their lives.  The court considered the harm to be "one of the strongest factors."

¶ 55    The court also found deterrence to be a strong factor in this case.  The court stated, "our society demands a strong sentence for this type of conduct."  Further, the court stated there is a strong need to protect the public and children from this type of conduct.

¶ 56    Concerning factors in mitigation, the trial court found defendant's minimal criminal record was "obviously not aggravating" and "mitigating to the extent that it's minimal."  The court recognized that defendant was not required to show any remorse or make a statement in allocution.  The court stated, "There are generally mitigating factors in every case; but I have

nothing in mitigation; and I scrolled through the list." Ultimately, the court imposed the maximum sentence where it sentenced defendant to 60 years' imprisonment for predatory criminal sexual assault, consecutive to a 7-year sentence for aggravated criminal sexual abuse, and consecutive to a 7-year sentence for indecent solicitation of a child.

¶ 57          In April 2019, defendant filed a motion for reconsideration of sentence. In the motion, defendant asserted the trial court failed to consider all mitigating factors and alleged the court imposed an excessive sentence. At a May 2019 hearing, the trial court denied defendant's motion finding it took into consideration aggravating and mitigating factors in sentencing defendant but given the aggravating factors in this case, the sentence was appropriate.

¶ 58          This appeal followed.

¶ 59                              II. ANALYSIS

¶ 60          On appeal, defendant argues (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the trial court erred in imposing consecutive sentences; and (3) the trial court abused its discretion in sentencing him to an excessive aggregate sentence of 74 years' imprisonment. We review each issue in turn.

¶ 61                          A. Sufficiency of the Evidence

¶ 62          When considering the sufficiency of the evidence, we determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the required elements of the crime beyond a reasonable doubt. *People v. Bradford*, 2016 IL 118674, ¶ 12, 50 N.E.3d 1112. "It is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *Id.* In a bench trial, it is for the trial judge, sitting as the trier of fact, to determine the credibility and weight of the testimony, to resolve the inconsistencies and conflicts therein, and to render its

- 17 -

decision accordingly. *People v. Berland*, 74 Ill. 2d 286, 305-06, 385 N.E.2d 649, 658 (1978). "Accordingly, a reviewing court will not substitute its judgment for the fact finder on questions involving the weight of the evidence or the credibility of the witnesses." *Bradford*, 2016 IL 118674, ¶ 12. Further, a reviewing court will not reverse a conviction simply because the defendant claims that a witness was not credible or because the evidence is contradictory. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228, 920 N.E.2d 233, 243 (2009). "A conviction will be reversed only where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Belknap*, 2014 IL 117094, ¶ 67, 23 N.E.3d 325.

¶ 63 To prove defendant guilty of predatory criminal sexual assault (720 ILCS 5/11-1.40(a)(1) (West 2012)), the State had to establish beyond a reasonable doubt that defendant, who was 17 years of age or older, committed an act of sexual penetration with K.S., who was under 13 years of age when the act was committed, where defendant knowingly penetrated the anus of K.S. with his penis between January 1, 2013, and December 31, 2013. 720 ILCS 5/11-1.40(a)(1) (West 2012).

¶ 64 To prove defendant guilty of criminal sexual assault (720 ILCS 5/11-1.20(a)(3) (West 2012)), the State had to establish beyond a reasonable doubt that defendant committed an act of sexual penetration with K.S., a family member and person under 18 years of age, where he penetrated the anus of K.S. with his penis between January 1, 2013, and December 31, 2013. 720 ILCS 5/11-1.20(a)(3) (West 2012).

¶ 65 To prove defendant guilty of criminal sexual abuse (720 ILCS 5/11-1.60(b) (West 2012)), the State had to establish beyond a reasonable doubt that defendant, a family member of K.S., committed an act of sexual conduct with K.S., who was under 18 years of age, where

between May 1, 2016, and May 30, 2016, defendant forced K.S. to pose nude while he masturbated and touched K.S.'s breasts, for the purpose of sexual gratification or arousal of defendant. 720 ILCS 5/11-1.60(b) (West 2012).

¶ 66　　　　To prove defendant guilty of indecent solicitation of a child (720 ILCS 5/11-6(a) (West 2012)), the State had to establish beyond a reasonable doubt that defendant, a person who was 17 years of age or older, with the intent to commit the offense of criminal sexual assault, knowingly solicited Z.S., a child, to perform an act of sexual conduct or penetration upon K.S., a family member under 18 years of age, between January 1, 2008, and December 31, 2010. 720 ILCS 5/11-6(a) (West 2012)).

¶ 67　　　　Defendant argues no rational trier of fact could find him guilty beyond a reasonable doubt based on K.S.'s and Z.S.'s testimony. Defendant notes the State's case heavily relied on K.S.'s and Z.S.'s testimony which was impeached with prior inconsistent statements. On the other hand, defendant provided witnesses who presented "unimpeached testimony that was directly opposite to that of K.S. and Z.S." The State contends the trial court rationally deemed the prosecution's case to be "overwhelming" where both K.S. and Z.S. were "very credible" and "very consistent." Further, the State asserts the court rationally attributed K.S.'s and Z.S.'s prior inconsistent statements to differences in how they were questioned and conflicts in the evidence to differences in the witnesses' memories and perspectives.

¶ 68　　　　In this case, we find the trial court was in the best position to determine the credibility and weight of the testimony and to resolve the inconsistencies and conflicts therein. See *Berland*, 74 Ill. 2d at 305-06. Both K.S. and Z.S. testified defendant sexually abused them starting at a young age. Specifically, K.S. testified defendant first made her pose naked, then he began to touch her, and he eventually put his penis in her anus. K.S. also testified defendant

groped her breasts. Further, K.S. testified defendant forced Z.S. to put his penis on her vagina. Z.S. also testified he performed a "humping motion" on K.S. with defendant watching and masturbating. Z.S. stated during the encounters with K.S. they were both naked and his penis touched K.S.'s vagina.

¶ 69 The trial court observed both K.S. and Z.S. testify at trial and noted their demeanor, as well as the amount of detail that they provided. Specifically, the court found Z.S.'s "very lengthy" testimony to be "pretty consistent" where he used age-appropriate words to describe the sexual activity. Further, the court found Z.S.'s demeanor while testifying "was very timid and quiet, but it was also wholly appropriate considering the subject matter." Based on his age and the nature of the difficult subject matter, the court stated Z.S. handled himself "pretty well." The court found Z.S. to be "a very credible witness."

¶ 70 As to K.S., the court found K.S. provided a "considerable amount of detail concerning the specific instances including how they were positioned, where their clothes were, [and] what areas of her body he was having contact with." The court noted it would expect children at that age to "remember those types of details," but the court "would not expect them to come in here and say, yes, yes, I was 12 years old the last time this happened. I was 15 years old the last time this happened. I was five years old the first time this happened." The court opined K.S. appeared to be "pretty timid" and "she was pretty quiet during her testimony." The court found K.S. to be "most sincere" when she "discussed how this came out." The court determined K.S. to be "a very credible witness." Moreover, the court found K.S.'s testimony was corroborated by Z.S.'s testimony as to "the core allegations in this case."

¶ 71 While defendant provided testimony of other witnesses, including the children's grandfather and cousin, we agree with the trial court that just because their recollection differed

from K.S. and Z.S., that does not mean K.S. and Z.S. were any less credible. The trial court found B.C. credible but noted a difference in his recollection of events from when he was "very young" did not mean that K.S. and Z.S. were lying. Further, as the State provided above, the trial court rationally attributed K.S.'s and Z.S.'s prior inconsistent statements to differences in how they were questioned and conflicts in the evidence to differences in the witnesses' memories and perspectives.

¶ 72        We will not reverse a conviction simply because defendant claims K.S. and Z.S. were not credible or because a witness's recollection of the evidence is contradictory. See *Siguenza-Brito*, 235 Ill. 2d at 228. Rather, we defer to the trial court who assessed every witness and made reasonable credibility determinations based on the witness's demeanor and testimony. Accordingly, when viewing all the evidence in the light most favorable to the State, we find the State presented sufficient evidence for the trial court to find defendant guilty beyond a reasonable doubt.

¶ 73                            B. Consecutive Sentences

¶ 74        Defendant next argues the trial court improperly made his seven-year sentences on counts III and IV consecutive to each other. Defendant asserts his seven-year prison terms should be concurrent to one another and consecutive to his sentence for predatory criminal sexual assault. The State acknowledges predatory criminal sexual assault is the only offense that triggers mandatory consecutive sentencing; however, the State provides it was within the trial court's discretion to impose consecutive sentences to protect the public. Further, the State argues invited error, where defendant "invited" the trial court to determine all the sentences were required to be consecutive. Thus, the State argues defendant is left only with a claim of ineffective assistance of counsel.

¶ 75        Initially, we note defense counsel agreed that defendant's sentences should run consecutive to each other.  During the sentencing hearing, the trial court in discussing the sentencing ranges with both parties stated, "So Count 1 is six to 60.  Count 2 to merge with Count 1.  Counts 3 and 4 are three to seven consecutive to each other and consecutive to Count 1.  So all three counts are consecutive, and Count 2 merges."  Both parties responded, "Yes." Further, defense counsel in arguing his sentencing recommendation clarified counts I, III, and IV "have to be consecutive, so I believe that serving a sentence, a 12 year sentence will result in him serving nine years; and I believe that's the appropriate sentence."  Where counsel affirmatively agreed to the imposition of consecutive sentences on all three counts, the issue is waived.  See *People v Dunlap*, 2013 IL App (4th) 110892, ¶ 12, 992 N.E.2d 184.  Moreover, where defense counsel acquiesces to the action of the trial court, a defendant's only challenge lies in a claim for ineffective assistance of counsel.  See *id.*  However, defendant fails to raise such a challenge. Therefore, we decline to address an ineffective assistance of trial counsel claim.

¶ 76                        C.  Excessive Sentence

¶ 77        Last, defendant argues his aggregate 74-year prison sentence is excessive. Defendant contends the trial court abused its discretion by not giving weight to any mitigating factors and imposing the maximum sentence.  We disagree.

¶ 78        The trial court has discretion in sentencing, and we will not reverse a sentence absent an abuse of discretion.  *People v. Snyder*, 2011 IL 111382, ¶ 36, 959 N.E.2d 656.  Such discretion in sentencing is necessary because "the trial court is in a better position to judge the credibility of the witnesses and the weight of the evidence at the sentencing hearing."  *People v. Ramos*, 353 Ill. App. 3d 133, 137, 817 N.E.2d 1110, 1115 (2004).  "A sentence which falls within the statutory range is not an abuse of discretion unless it is manifestly disproportionate to

- 22 -

the nature of the offense." *People v. Franks*, 292 Ill. App. 3d 776, 779, 686 N.E.2d 361, 363 (1997).

¶ 79        "In considering the propriety of a sentence, the reviewing court must proceed with great caution and must not substitute its judgment for that of the trial court merely because it would have weighed the factors differently." *People v. Fern*, 189 Ill. 2d 48, 53-54, 723 N.E.2d 207, 209-10 (1999).  "A sentence imposed by the trial court is presumed to be proper." *People v. Butler*, 2013 IL App (1st) 120923, ¶ 31, 994 N.E.2d 89.  "There is a strong presumption that the trial court considered any evidence of mitigation presented to it." *Id.*  "In order to rebut this presumption, the defendant must present some indication, other than the sentence imposed, that the trial court did not consider the mitigating evidence." *Id.*

¶ 80        The trial court errs when the sentence is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210, 737 N.E.2d 626, 629 (2000).  As the court determines an appropriate sentence, "a defendant's history, character, and rehabilitative potential, along with the seriousness of the offense, the need to protect society, and the need for deterrence and punishment, must be equally weighed." *People v. Hernandez*, 319 Ill. App. 3d 520, 529, 745 N.E.2d 673, 681 (2001).  "A defendant's potential for rehabilitation is not given greater weight than the seriousness of the crime." *People v. Haley*, 2011 IL App (1st) 093585, ¶ 64, 960 N.E.2d 670.

¶ 81        In determining defendant's sentence, the trial court considered the evidence received at trial, the presentence report, victim impact statements, relevant statutory factors, including the factors in aggravation and mitigation, and defendant's rehabilitative potential.  The court determined the sexual abuse was not an isolated incident on defendant's part but rather

ongoing abuse involving more than one victim which spanned over an extended period of time. Defendant held a "position of trust" over the children as their father, and the court found defendant took advantage of that position. The court noted "this is one of the of the most extreme cases of predatory criminal sexual abuse." As a result, the court found defendant's conduct caused serious harm to the children and considered the harm caused to be "one of the strongest factors."

¶ 82     Further, the court found deterrence to be a strong factor in this case, where "our society demands a strong sentence for this type of conduct." The court emphasized a strong need to protect the public and children from this type of conduct.

¶ 83     The court addressed the factors in migration, finding defendant's minimal criminal record was "obviously not aggravating" and "mitigating to the extent that it's minimal." The court also recognized that defendant was not required to show any remorse or make a statement in allocution. Ultimately, the court stated, "There are generally mitigating factors in every case; but I have nothing in mitigation; and I scrolled through the list."

¶ 84     We find the trial court did not abuse its discretion when it sentenced defendant to an aggregate sentence of 74 years in prison because the sentence fell within the statutory range and was not disproportionate to the nature of the offense. The court at sentencing analyzed the factors in mitigation and even noted defendant was not required to show any remorse or make a statement in allocution. Where the court ultimately found the aggravating factors outweighed the minimal mitigating factors, we cannot say the court abused its discretion by sentencing defendant to an aggregate sentence of 74 years' imprisonment in this case.

¶ 85                               III. CONCLUSION

¶ 86     For the reasons stated, we affirm the trial court's judgment.

- 24 -

¶ 87          Affirmed.