NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210360-U

NO. 4-21-0360

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 5, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Coles County |
| BRIAN T. GRIFFIN, | ) | No. 18CF114 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | James R. Glenn, |
| | ) | Judge Presiding. |

_____

JUSTICE HOLDER WHITE delivered the judgment of the court.
Presiding Justice Knecht and Justice DeArmond concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The appellate court affirmed, concluding the trial court did not err in imposing a
24-year sentence.

¶ 2     In February 2018, the State charged defendant, Brian T. Griffin, with aggravated

arson (720 ILCS 5/20-1.1(a) (West 2016)) (count I).  In March 2018, the State added an

additional charge, attempt (first degree murder) (*id.* §§ 8-4, 9-1(a)(1)) (count II).  On February 7,

2019, defendant pleaded guilty to one count of aggravated arson (*id.* § 20-1.1(a)) (count I).

Following an April 16, 2019, sentencing hearing, the trial court sentenced defendant to 24 years

in prison.

¶ 3     Defendant appeals, arguing the trial court committed plain error under both

prongs of the plain-error doctrine and deprived defendant of a fair sentencing hearing where it

refused to give weight to applicable statutory factors in mitigation and the sentencing evidence was closely balanced. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5        On February 21, 2018, the State charged defendant by information with one count of aggravated arson, a Class X felony (*id.* § 20-1.1(a), (b)) (count I). On March 29, 2018, the State charged defendant by information with one count of attempt (first degree murder), a Class X felony (*id.* §§ 8-4, 9-1(a)(1)) (count II). The charges stemmed from an incident that occurred during the early morning hours of February 16, 2018.

¶ 6                                    A.  Guilty Plea

¶ 7        On February 7, 2019, defendant pleaded guilty to one count of aggravated arson (*id.* § 20-1.1(a)) (count I). In exchange for defendant's guilty plea, the State agreed to dismiss count II and other charges pending against defendant in separate cases. The State asserted a factual basis as follows:

> "On or about February 16, 2018, the defendant set fire to the
>
> building at 506 Monroe Avenue here in Charleston, commonly
>
> known as Mother's Bar.
>
>      At the time that he set fire to that building, he knew or
>
> reasonably should have known that there were one or more persons
>
> present inside that building."

Defense counsel agreed with the State's recitation of the facts. The trial court stated, "I find that the defendant is informed of and understands the nature of the charge, the range of possible sentences, and his rights under the law. I find that the guilty plea is knowingly and voluntarily made and that a factual basis exists." The court then set the matter for a sentencing hearing.

¶ 8                          B.  Defendant's Sentencing Hearing

¶ 9            On April 16, 2019, the trial court held a sentencing hearing.  Before presenting

evidence, the parties stipulated to the admission and publication of video surveillance recorded

on February 16, 2018, during the early morning hours at Huck's convenience store in Charleston.

The State then presented the following evidence through multiple witnesses.

¶ 10           Brandon Bell testified that in February 2018, he and his wife owned Mother's Bar

in Charleston, Illinois, and multiple apartments above the bar.  Bell identified defendant, in

court, as a former tenant who lived in one of the apartments above Mother's Bar. Defendant

moved out of the apartment prior to February 16, 2018, when a family member of defendant's

moved in.  Bell testified that in the early morning hours of February 16, 2018, he and his wife

were notified by a tenant that Mother's Bar and the apartments above were on fire.  Bell testified

all tenants made it safely out of the building.

¶ 11           The State admitted and published video recordings from the early morning hours

of February 16, 2018, taken from surveillance cameras inside and outside Mother's Bar.  Bell

described the location of the cameras, one being outside the entrance to go upstairs to the

apartments.  Bell testified the video recordings from the early morning hours of February 16,

2018, showed a person enter the door which led up to the apartments.  The State also admitted

and published three 911 call recordings from the early morning hours of February 16, 2018.  Bell

testified that due to the fire, the building was a total loss and torn down.

¶ 12           Haley Peterson testified that on February 16, 2018, she lived in an apartment

above Mother's Bar with her two children, ages five years old and two months old.  In the early

morning hours of February 16, 2018, Peterson woke up to smoke in her apartment.  Peterson

grabbed her two children and exited the building and called the owners to notify them about the

fire. Peterson testified she lost everything in the fire except the clothes she was wearing. Peterson also testified that since the fire, her two-month-old daughter had experienced lung issues and had a constant cough from the smoke.

¶ 13    Steve Bennett, Fire Chief of the Charleston Fire Department, testified that in the early morning hours of February 16, 2018, he reported to a fire at 506 Monroe in Charleston. Chief Bennett stated two individuals had to be rescued from the roof of the building. Chief Bennett identified the two individuals rescued from the roof as Luther Holden and Karley Carter. Chief Bennett indicated nine people were in the building when the fire occurred. Other than minor smoke inhalation, none of the nine occupants suffered any medical injuries.

¶ 14    Chief Bennett also testified the fire eventually went up to a third alarm fire and that in his career, he had only experienced a fire to that degree "probably three or four times." The State admitted and published video the Charleston Fire Department recorded during the fire. Chief Bennett testified that after the fire was extinguished, an arson canine was "used to detect any possible flammable liquids that may have been used" to start the fire. Chief Bennett stated, "The canine made some hits or identified several spots on the second floor that potentially could have been a substance like an ignitable liquid. The fire marshal then took samples and sent them to their lab." Chief Bennett believed the samples showed the use of an ignitable liquid "[s]uch as gasoline." Chief Bennett testified, "We attempted to locate a gas can, but we were unable to locate one." The State also admitted and published overhead drone video footage showing the aftermath of the fire.

¶ 15    Michael Day, the owner of Mike and Stan's 504 Club, testified he owned the building next to Mother's Bar. When asked what impact the fire at Mother's Bar had on his building, Day responded, "Extensive water damage, smoke damage. Of course, closed—forced

us to close for four months, right approximately four months." Day testified that, while his business had insurance, it did not cover all of the expenses from the fire.

¶ 16    Anthony West, chief of investigations for the Charleston Police Department, testified he investigated and processed the scene of the fire the day after the blaze and interviewed several witnesses. West testified that through another officer's investigation into the circumstances surrounding the fire, defendant was identified as a suspect. West stated he learned the occupant of apartment three, above Mother's Bar, was Luther Holden, whose sister, Willa Griffin, was in a relationship with defendant. On February 15, 2018, defendant and Willa's father, Willie Grady, got into an altercation as Grady tried to help Willa move out of her and defendant's shared residence. West testified that a few days after the fire, he interviewed Luther, who believed defendant to be responsible for setting the fire. West further testified Luther told him that on February 15, 2018, after his father and defendant got into an altercation, his father asked him for assistance, so Luther went to defendant and Willa's residence where Luther intended to beat up defendant but defendant ran off. West testified Luther told him that a couple hours later, Luther received a Snapchat message from defendant indicating he was going to kill Luther.

¶ 17    Following his interview with Luther, West obtained video surveillance from places around Mother's Bar, including surveillance from inside and outside of Mother's Bar and Huck's convenience store. West testified that Huck's was located about a block north of Mother's Bar. West viewed the February 16, 2018, surveillance recordings from Huck's and recognized defendant in the videos. In the video, the person West recognized as defendant purchased a small plastic gas container and filled it with gasoline before walking away from the station. West testified he obtained a receipt from Huck's dated February 16, 2018, time stamped

1:27 a.m., listing items purchased by defendant, which included, a gasoline canister, gasoline, and a BIC lighter. West also viewed the February 16, 2018, surveillance recordings from outside Mother's Bar and testified, "I don't know that I could make out his face, but the clothing that that person was wearing matched that being worn by [defendant], who was in Huck's a few moments before." West testified that during the investigation into the fire, a black nozzle was located at the top of the stairs that lead to the apartments above Mother's Bar. West stated "it was believed the fire had begun or had been started" outside apartment three.

¶ 18 Following the State's presentation of evidence, defense counsel called two witnesses and offered multiple letters supporting defendant. James Irwin, a mentor in a faith-based counseling program at Coles County Safety and Detention Center, testified defendant participated in the faith-based counseling program. Irwin testified that prior to participating in the program, defendant tried to commit suicide while in jail and other inmates described him as being depressed. Irwin testified that when he first met defendant, defendant was "[v]ery, very, very despondent, but he was just very, very sorry." Irwin stated that, eventually, "I really saw [defendant] growing as a person. He—he got to the place where instead of just being despondent and just laying in his bunk or whatever he was doing all day long, he began to relate to the other men." Irwin also testified defendant began a twelve-step program to address his alcohol issues. Irwin wrote a letter on defendant's behalf.

¶ 19 Vernon Griffin, defendant's brother, testified as a spokesperson for his family and described defendant's upbringing. Vernon testified his and defendant's father struggled with demons, stating, "My dad was—it was almost like two sides to my dad." Vernon stated that "when my father started drinking, it became a rage." Vernon testified defendant had a different upbringing from his siblings, who were significantly older, because their parents got divorced

when defendant was young. Vernon stated defendant struggled when he was younger and was diagnosed with mental health issues. Vernon testified defendant knew the difference between wrong and right. Vernon also stated defendant "could smile and say some evil stuff when he's in a rage."

¶ 20        The trial court admitted into evidence multiple letters supporting defendant. Of the numerous letters submitted, both Willie Grady and Willa Griffin submitted letters. Willa's letter described defendant as a great father to both his stepson and their child. Willa stated defendant continued to be there for the children even while incarcerated where he called the children several times a week and checked in on them. Willie Grady's letter described defendant as a good father to his children. Further, a doctor who evaluated defendant submitted a letter describing defendant's history of mental health issues. Defendant also made a statement in allocution.

¶ 21        Following the presentation of evidence, the State moved to dismiss count II and defendant's pending charge in Coles County case No. 18-CM-89. The State also agreed to withdraw a petition to revoke probation in Coles County case No. 14-CF-573. The parties also presented an agreed restitution and financial sentencing order to the trial court. The State informed the court that defendant, a Class X offender, was subject to a sentencing range of 6 to 30 years in prison. The State recommended the court sentence defendant to the maximum sentence of 30 years' imprisonment. Defense counsel recommended the court sentence defendant to 12 years' imprisonment.

¶ 22        In imposing sentence, the trial court considered defendant's presentence investigation (PSI) report, all documentary exhibits and testimony presented, defendant's statement in allocution, and the evidence in aggravation and mitigation. The PSI report detailed

defendant's (1) criminal history; (2) family, educational, and employment background; (3) mental health issues, including a Bipolar Disorder diagnosis; and (4) history of substance abuse. The PSI report also included a victim-impact statement provided by Luther.

¶ 23　　　　The trial court found defendant's criminal history to be "moderate to less than moderate." The court then went on to consider the relevant factors in mitigation. The court determined the factor of whether "there [were] substantial grounds tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense" was not applicable in defendant's case. Further, while the court acknowledged defendant willingly signed a financial sentencing order to compensate the victims, the court stated, "Hopefully [defendant] is able to do that to make some of these victims whole, but I don't see it. I don't find that factor to be applicable." The court also stated that, while defendant's history of prior criminal activity was not substantial, that did not mean that factor in mitigation would apply. The court could not say "criminal conduct would not likely recur."

¶ 24　　　　The trial court also addressed the likelihood of excessive hardship to defendant's dependents. The court stated, "I haven't heard evidence about the support [defendant] has provided for his son." The court acknowledged it sounded like defendant was a good father to both his son and stepson, but the court determined defendant's son did not live in the state anymore. The court did not "see where the imprisonment is an excessive hardship to the dependent or to the step-child." The court also addressed defendant's mental health. Specifically, the court stated,

> "[A]t the time of the offense, the defendant was suffering from a
> serious mental illness, which, though insufficient to establish the
> defense of insanity, substantially affected his or her ability to

understand the nature of his or her acts or to conform his or her conduct to the requirements of the law, I don't find that to be applicable.

I think he understood what he was doing. I could tell as I'm watching him purchase the items at Huck's and I could tell as I saw him wander up to the apartment building above Mother's. I don't find that factor to be applicable, so I really don't find any of the factors in mitigation to apply here."

¶ 25 The trial court then addressed the relevant factors in aggravation, finding multiple factors in aggravation applied. The court found (1) defendant's conduct "caused or threatened serious harm," (2) defendant had a history of criminal activity, (3) a prison sentence was necessary to deter others from committing the same crime, and (4) defendant "was convicted of a felony committed while he was serving a period of probation for a prior felony." The court addressed the documentary exhibits and testimony presented which tended to show the destruction of not only local businesses but also of people's residences and possessions. The court further found defendant's actions also threatened the lives of the people inside the building on the night of the fire. The court stated, "This crime was a cold, calculated, premeditated, senseless, malicious, and mean-spirited act, and as [defendant] admitted himself in his statement, it was careless and cruel, and it could have led to tragic and unspeakable consequences."

¶ 26 The trial court did however recognize the evidence presented tended to show defendant was (1) engaged in a faith-based mentoring program, (2) doing better, and (3) willing to accept the consequences, which the court described as "respectable." While the court acknowledged defendant was improving with the faith-based program, the court found defendant

grew up in a faith-based household with "a caring, compassionate mother, a devout Christian, and with impressive, successful siblings who are all standing up for you in your time of need. Yet this happened."

¶ 27    The trial court determined (1) defendant's criminal history was not substantial and (2) he took responsibility and pled guilty. Thus, the court did not think a maximum sentence was appropriate. However, the court determined the sentence suggested by the defense would "deprecate the seriousness of the offender's conduct, despite his lack of a substantial criminal history and the fact that he pled guilty." Ultimately, the court sentenced defendant to 24 years in prison. On April 23, 2019, the court filed a written sentencing order.

¶ 28    C. Defendant's Motion to Reconsider Sentence

¶ 29    On May 15, 2019, defendant filed a motion to reconsider sentence. In his motion, defendant argued, in relevant part, that while the trial court heard evidence about his significant mental health history, the court "refused to consider the Defendant's mental health history as a mitigating factor." Defendant also asserted the court improperly considered the factor of serious harm where serious harm was implicit in the charge of aggravated arson. Defense counsel also filed a certificate of compliance pursuant to Illinois Supreme Court Rule 604(d) (eff. July 1, 2017), which only included language about defendant's sentence.

¶ 30    During a December 9, 2019, hearing on defendant's motion to reconsider sentence, defense counsel asked to file his certificate of compliance pursuant to Rule 604(d). Counsel explained he did not address defendant's guilty plea in the certificate because defendant only wished to challenge his sentence. The court accepted the certificate of compliance and the parties proceeded to address defendant's motion to reconsider sentence. Defense counsel argued the trial court went too far in addressing the factors in aggravation "in light of the fact that the

- 10 -

Court here, to my knowledge, found no factors in mitigation; did not decide, for example, that [defendant's] mental health should have been taken into account as presented at this sentencing hearing." The trial court noted it considered the relevant factors in mitigation and aggravation and that the sentence it "handed down was within the sentencing range of the charged offense." Ultimately, the court denied defendant's motion to reconsider sentence.

¶ 31    On December 31, 2019, defendant appealed, and we remanded the case where trial counsel failed to strictly comply with Rule 604(d) because counsel failed to review the plea proceedings. On remand, trial counsel filed a new, facially valid certificate of compliance pursuant to Rule 604(d). On July 30, 2020, defendant appealed, and we vacated and remanded the case to the trial court for (1) the filing of a Rule 604(d) certificate, (2) the opportunity to file a new Rule 604(d) motion, (3) a new hearing, (4) a ruling on all pending Rule 604(d) motions, and (5) strict compliance with the requirements of Rule 604(d).

¶ 32    Following the second remand, trial counsel, on June 22, 2021, filed a new certificate of compliance pursuant to Rule 604(d). Subsequently, the trial court held a hearing on defendant's May 15, 2019, motion to reconsider sentence. The trial court found defendant's sentence was based on a combination of the various factors and "the circumstances and nature of the events." Specifically, the court noted it considered defendant's mental health as a factor in mitigation but determined the "factor did not exist and specifically that the Defendant understood the nature of his acts." Ultimately, the court denied defendant's motion to reconsider sentence.

¶ 33    This appeal followed.

¶ 34                                    II. ANALYSIS

¶ 35    Defendant argues the trial court committed plain error under both prongs of the plain-error doctrine and deprived him of a fair sentencing hearing where it refused to give weight

to applicable statutory factors in mitigation and the sentencing evidence was closely balanced. The State agrees defendant forfeited his argument on appeal but argues the trial court did not err when it considered evidence in mitigation but found mitigating evidence to be inapplicable during defendant's sentencing hearing.

¶ 36  "[T]o preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." *People v. Hillier*, 137 Ill. 2d 539, 544, 931 N.E.2d 1184, 1187 (2010). Failure to make a contemporaneous objection and raise the issue in a written postsentencing motion constitutes forfeiture. *People v. Sebby*, 2017 IL 119445, ¶ 48, 89 N.E.3d 675. However, we may consider a forfeited claim where the defendant demonstrates a plain error occurred. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). To prevail under the plain-error doctrine, defendant must first demonstrate a clear and obvious error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11 (2007). If an error occurred, we will only reverse where (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Id.*

¶ 37  Defendant admits he failed to preserve this issue in his motion to reconsider. However, defendant asks this court to review the issue as a matter of plain error. Thus, we must first determine whether a clear or obvious error occurred. See *id.*

¶ 38  The Unified Code of Corrections sets forth mitigating and aggravating factors the trial court must consider when determining an appropriate sentence. 730 ILCS 5/5-5-3.1, 5-5-3.2 (West 2016). However, the trial court need not explicitly analyze each relevant factor or articulate the basis for the sentence imposed; thus, when mitigating evidence is presented before

the court, it is presumed the court considered the evidence in imposing a sentence. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46, 19 N.E.3d 1070.

¶ 39     The trial court errs when the sentence is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210, 737 N.E.2d 626, 629 (2000). As the court determines an appropriate sentence, "a defendant's history, character, and rehabilitative potential, along with the seriousness of the offense, the need to protect society, and the need for deterrence and punishment, must be equally weighed." *People v. Hernandez*, 319 Ill. App. 3d 520, 529, 745 N.E.2d 673, 681 (2001). "A defendant's potential for rehabilitation is not given greater weight than the seriousness of the crime." *People v. Haley*, 2011 IL App (1st) 093585, ¶ 64, 960 N.E.2d 670.

¶ 40     The trial court has discretion in sentencing, and we will not reverse a sentence absent an abuse of discretion. *People v. Snyder*, 2011 IL 111382, ¶ 36, 959 N.E.2d 656. Such discretion in sentencing is necessary because "the trial court is in a better position to judge the credibility of the witnesses and the weight of the evidence at the sentencing hearing." *People v. Ramos*, 353 Ill. App. 3d 133, 137, 817 N.E.2d 1110, 1115 (2004). "In considering the propriety of a sentence, the reviewing court must proceed with great caution and must not substitute its judgment for that of the trial court merely because it would have weighed the factors differently." *People v. Fern*, 189 Ill. 2d 48, 53-54, 723 N.E.2d 207, 209-10 (1999). Moreover, "[a] sentence which falls within the statutory range is not an abuse of discretion unless it is manifestly disproportionate to the nature of the offense." *People v. Franks*, 292 Ill. App. 3d 776, 779, 686 N.E.2d 361, 363 (1997).

¶ 41        Defendant pled guilty to aggravated arson, a Class X felony (720 ILCS 5/20-1.1(a), (b) (West 2016)), which carries a sentence between 6 and 30 years in prison (730 ILCS 5/5-4.5-25(a) (West 2016)).  The trial court sentenced defendant to a 24-year prison sentence.  Thus, because the court's 24-year sentence fell within the permissible sentencing range, it is presumed to be proper, and we will not disturb the sentence absent an abuse of discretion.

¶ 42        In determining defendant's sentence, the trial court considered all of the documentary exhibits and testimony presented at the sentencing hearing, defendant's statement in allocution, the evidence in aggravation and mitigation, and the information in defendant's PSI report.  The PSI report detailed defendant's (1) criminal history; (2) family, educational, and employment background; (3) mental health issues; and (4) history of substance abuse.  The PSI report also included a victim impact statement provided by Luther.  The court summarized its reasoning for sentencing defendant to 24 years' imprisonment by discussing the relevant factors in aggravation and mitigation.  Specifically, the court addressed defendant's moderate criminal history, the likelihood of excessive hardship to defendant's dependents if incarcerated, defendant's mental health, the seriousness of the offense, the need for deterrence, and defendant's willingness to accept responsibility by pleading guilty.

¶ 43        Defendant argues the trial court abused its discretion when it refused to give any weight to the applicable statutory factors in mitigation.  Defendant asserts this was evident where the court in sentencing defendant stated, "I really don't find any of the factors in mitigation to apply here."  Defendant argues he presented evidence to show significant mitigating factors existed, including that his mental state at the time of the offense impaired his ability to reason,

- 14 -

his incarceration would result in extreme and excessive hardship to his dependents, and his rehabilitative potential.

¶ 44      The State argues the court did not err in sentencing defendant because it considered evidence in mitigation during defendant's sentencing hearing but found mitigating evidence to be inapplicable.  Specifically, the State asserts the court considered defendant's mental state at the time of the offense but found that defendant knew right from wrong, thus the factor in mitigation was not applicable.  Further, the State argues defendant is incorrect where he argues the court did not consider the hardship his incarceration would have on his son and stepson.  The State provides the court never stated defendant's imprisonment would not pose any hardship; rather, the court stated it would not cause excessive hardship.  Thus, the State argues the court did not err when it found this factor did not apply in defendant's case.  We agree with the State and find the trial court did not abuse its discretion in sentencing defendant.

¶ 45      While the trial court did say, "I really don't find any of the factors in mitigation to apply here," we must consider the sentencing hearing in its entirety.  When we do so, we find the trial court took into consideration the PSI report and weighed the relevant factors in mitigation compared with the factors in aggravation.  In imposing defendant's sentence, the court considered numerous factors in mitigation, including (1) whether substantial grounds tended to excuse defendant's conduct, (2) defendant's willingness to financially compensate the victims, (3) defendant's "moderate to less than moderate" criminal history, (4) excessive hardship to defendant's dependents, and (5) defendant's mental health.

¶ 46      Specifically, the trial court acknowledged that at the time of the offense, defendant suffered from a serious mental illness; however, the court ultimately found that defendant knew what he was doing when he purchased items from Huck's and went to the

- 15 -

apartments above Mother's Bar. Contrary to defendant's assertion, the court considered defendant's mental health as a factor in mitigation and weighed his mental health against other evidence presented at sentencing. Therefore, we find the court exercised its discretion and determined this statutory factor did not weigh in favor of reducing defendant's sentence. See *Ramos*, 353 Ill. App. 3d at 137 ("[T]he trial court is in a better position to judge the credibility of the witnesses and the weight of the evidence at the sentencing hearing.").

¶ 47   The trial court further addressed the impact defendant's incarceration would have on his son and stepson. While the court acknowledged evidence was presented that showed defendant was a good father to his son and stepson, the court did not find defendant's imprisonment would cause excessive hardship to his dependent or stepson. The court specifically stated, "I haven't heard evidence about the support [defendant] has provided for his son." Based on the record, we find the court properly considered the impact defendant's incarceration would have on his son and stepson but ultimately determined defendant's incarceration would not result in excessive hardship.

¶ 48   We also reject any implication by defendant that the trial court failed to consider his rehabilitative potential. "A defendant's potential for rehabilitation is not given greater weight than the seriousness of the crime." *People v. Haley*, 2011 IL App (1st) 093585, ¶ 64, 960 N.E.2d 670. Moreover, "[t]he trial court is not 'required to make an express finding that defendant lacked rehabilitative potential.' " *Id.* (quoting *People v. Quintana*, 332 Ill. App. 3d 96, 109, 772 N.E.2d 833, 845 (2002)). Here, the court recognized the evidence presented tended to show defendant was (1) engaged in a faith-based mentoring program, (2) doing better, and (3) willing to accept the consequences, which the court described as "respectable."

¶ 49        Moreover, at the June 2021 hearing on defendant's motion to reconsider sentence, the trial court stated defendant's sentence was based on a "combination of various factors and the circumstances and nature of the events." As stated above, the trial court need not explicitly analyze each relevant mitigating factor or articulate the basis for the sentence imposed. *Knox*, 2014 IL App (1st) 120349, ¶ 46. Rather, any mitigating evidence presented before the court is presumed to have been considered by the court in imposing a sentence. *Id.*

¶ 50        We find the trial court did not abuse its discretion when it sentenced defendant to 24 years in prison because the sentence fell within the statutory range and was not disproportionate to the nature of the offense. The court at sentencing considered and weighed the relevant factors in mitigation. Where the court ultimately found the aggravating factors outweighed any mitigating factors, we cannot say the court abused its discretion by sentencing defendant to 24 years in prison. Accordingly, where defendant fails to demonstrate a clear or obvious error occurred, we reject his contention of plain error.

¶ 51                             III. CONCLUSION

¶ 52        For the reasons stated, we affirm the trial court's judgment.

¶ 53        Affirmed.